**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ernest Valencia Gonzales,<br><br>           Petitioner,<br><br>vs.<br><br>Dora B. Schriro, et al.,<br><br>           Respondents. | No. CV-99-2016-PHX-SMM<br><br>DEATH PENALTY CASE<br><br><br>**ORDER** |

Before the Court is Petitioner's Motion for Competency Determination and to Stay Proceedings. (Dkt. 102.)[1] For the reasons set forth herein, the motion is denied.

**BACKGROUND**

On November 15, 1999, Petitioner, an Arizona inmate sentenced to death, commenced these proceedings by filing a petition for a writ of habeas corpus. (Dkt. 1.) The Court appointed the Federal Public Defender's Office to represent Petitioner. (Dkt. 8.) On December 21, 1999, the Court issued a case management order setting a deadline for the filing of an amended petition. (Dkt. 17.) Citing Rule 2 of the Rules Governing § 2254 Cases, the order required the amended petition to "include every known constitutional error or deprivation entitling Petitioner to habeas relief" and to "set forth, in a clear and concise fashion, the legal and factual basis for each ground for relief. The factual basis shall include

---

[1] "Dkt." refers to the documents in this Court's file.

1   full citations to the appropriate portions of the record." (*Id.*)  On July 17, 2000, Petitioner
2   filed a 237-page first amended petition raising sixty claims. (Dkt. 28.)   Petitioner
3   subsequently withdrew thirteen unexhausted claims from the amended petition so that he
4   could pursue them in state court. (Dkt. 43.)  The parties thereafter completed briefing on the
5   procedural status of the remaining claims.  (*See* Dkts. 47,48, 54, 59.)

6   On January 12, 2006, the Court entered its order regarding the procedural status of the
7   claims submitted in the amended petition.  (Dkt. 97.)  The Court dismissed certain claims and
8   established a deadline for Petitioner to submit briefing on the merits of the remaining claims.
9   (*Id.*)  On February 23, 2006, prior to the deadline for filing his merits brief, counsel for
10  Petitioner moved to stay this action pursuant to *Rohan ex rel. Gates v. Woodford*, 334 F.3d
11  803 (9th Cir. 2003), contending that Petitioner was no longer capable of rationally
12  communicating with or assisting habeas counsel.  (Dkt. 102.)  The motion indicated that
13  since October 2003 Petitioner had refused some twenty-six attempted visits from habeas
14  counsel and support staff, who wished to "discuss these upcoming proceedings, including
15  merits briefing and requests for evidentiary development." (*Id.* at 5-6.)  Counsel indicated
16  that they needed Petitioner's assistance in order to brief the merits of a number of claims.
17  (Dkts. 102, 108.)  Following Petitioner's *Rohan* motion, and based upon the Court's initial
18  review of the allegations and evidence concerning Petitioner's mental state, the Court
19  allowed an evaluation of Petitioner's competence to proceed, and each party enlisted a
20  mental health expert.  (Dkt. 111.)

21  The parties' experts, both psychiatrists, reached conflicting conclusions.
22  Respondents' expert, Dr. Anna Scherzer, performed an independent psychiatric consultation,
23  which included an eight-hour interview and the administration of a number of assessment
24  instruments, and prepared a detailed thirty-page report. (Dkt. 124.)  Dr. Scherzer concluded
25  to a reasonable degree of medical/psychiatric certainty that Petitioner "has the capacity to
26  understand his legal position" and "has the capacity to communicate in a comprehensible
27  manner." (*Id.* at 1.)   She noted that "[a]s the interview progressed, Mr. Gonzales
28

- 2 -

demonstrated periods of reflection, normal speech pattern, conversationally appropriate amplitude and logical appreciation of the reality of his circumstances, . . . demonstrat[ing] awareness of the central issue of when the government would carry out the already imposed death penalty." (*Id.* at 29.) Dr. Scherzer also explained that the results of the instruments she administered were "consistent with volitional feigning and malingered exaggeration of symptom [sic] of mental illness" and "were not consistent with expected patterns of known psychiatric disorders." (*Id.* at 2-3.) Furthermore, according to Dr. Scherzer, Petitioner acknowledged that "he has volitionally chosen not to communicate with his attorney," and "he verbalized his desire to be found incompetent, (and thereby delay or avoid death by lethal gas)." (Dkt.124 at 2.) However, while in Dr. Scherzer's professional opinion Petitioner "is knowingly choosing to present himself as severely mentally ill, this does not exclude the presence of a psychiatric disorder." (*Id.* at 29.) Dr. Scherzer recommended a period of "locked mental health observation" to determine if Petitioner's symptoms were indeed feigned and, if the symptoms persisted, treatment with "atypical neuroleptics and mood stabilizing psychotropic medication." (*Id.* at 30.)

Petitioner's expert, Dr. Raphael Morris, after conducting a two-hour "psychiatric interview" and reviewing various records, diagnosed Petitioner with Schizophrenia, Disorganized Type and concluded that he "lacks the capacity to rationally communicate with counsel due to a disorganized thought process and a pressured and non-redirectable pattern of speech. In addition his current grandiose delusions interfere with his capacity to appreciate his current legal predicament." (Dkt. 125 at 2, 10.) Dr. Morris found, contrary to Dr. Scherzer, that Petitioner "is unable to have a coherent discussion about even the most benign topics much less provide input towards the defense team's investigations." (*Id.* at 10.) Dr. Morris recommended a course of anti-psychotic medication but characterized Petitioner's "prognosis for restoration of competency" as "guarded at best." (*Id.* at 2-3, 12).

After receiving the reports from Drs. Scherzer and Morris, the Court scheduled an evidentiary hearing. (Dkt. 131.) Prior to the hearing, however, Respondents filed a motion

- 3 -

requesting that Petitioner be transferred to the Arizona State Hospital ("ASH") for an extended mental health assessment; the Court granted the motion. (Dkts. 138, 147.) On October 10, 2007, at the end of the ninety-day assessment period, the supervising psychologist, Dr. James Seward, submitted a final report. Dr. Seward indicated that he "continue[d] to have reservations concerning the veracity of Mr. Gonzales's symptoms" and that "malingering cannot be ruled out." (Dkt. 160 at 1, 3.) Nevertheless, he concluded that Petitioner has a "genuine psychotic disorder" and is "currently unable to communicate rationally for any extended period of time, such as would be required by a legal proceeding." (*Id.* at 2). Dr. Seward became persuaded that Petitioner's symptoms were genuine after observing an improvement in Petitioner's capacity for rational thought during the brief period when Petitioner was compliant with a regimen of the antipsychotic medication, Aripiprazole, which was prescribed by his treating psychiatrist, Dr. Qureshi. (*Id.* at 2-3.) Despite the observations of Drs. Seward and Qureshi, and Petitioner's self-report that he had experienced "some benefit . . . regarding his thought processes," Petitioner asked to be taken off the medication, complaining of side effects such as back pain and restlessness.[2] (*Id.* at 2.) Upon receiving Dr. Seward's report and being informed that Petitioner had discontinued treatment with this potentially beneficial medication, the Court ordered briefing on the issue of involuntary administration of antipsychotic medication. (Dkt. 164.)

On October 15 and December 3, 2007, the Court held status hearings to address these latest developments. At the hearings, the discussion focused on the holdings in two cases.

---

[2] According to Dr. Seward, "full benefit from antipsychotic medication is expected within four to six weeks after initiation of treatment." Petitioner took Aripiprazole for approximately three weeks before discontinuing treatment. (Dkt. 160 at 3.)

Dr. Seward noted that in his most recent session with Petitioner, possibly as a result of the antipsychotic medication, Petitioner "demonstrated more capacity for rational thought than he has in our previous meetings." (*Id.*) "For the first 30 minutes of this contact he primarily related in a socially appropriate, rational, and coherent manner, with minimal disorganized and illogical thoughts." (*Id.* at 2.) However, for reasons Dr. Seward cannot explain, Petitioner then became hostile and irrational. (*Id.*)

- 4 -

1 In *Rohan*, 334 F.3d at 819, the Ninth Circuit held that capital habeas proceedings must be stayed, "pending restoration of competence," where a petitioner is unable to communicate rationally with counsel regarding claims that could benefit from such communication. In *Sell v. United States*, 539 U.S. 166, 169 (2003), the Supreme Court addressed the question "whether the Constitution permits the Government to administer antipsychotic drugs involuntarily to a mentally ill criminal defendant – in order to render that defendant competent to stand trial for serious, but nonviolent, crimes." The Court held that in limited circumstances forcible medication was permissible and established the analytical framework under which such determinations are made. *Id.*

In briefing completed prior to the December 3 status conference, Petitioner maintained that he was incompetent under *Rohan* and that, pursuant to the criteria set forth in *Sell*, he could not be restored to competency through involuntary medication. (Dkt. 177.) Noting that the issue involved – whether a habeas petitioner, convicted of a violent crime, could prevent action on his own petition by refusing to be restored to competence – was one of first impression, the Court ordered additional briefing on a number of questions. (Dkt. 180.) The initial question asked Petitioner to identify the specific claims and types of assistance "needed from Petitioner – beyond that already provided and submitted as part of the Amended Petition – to complete preparation of the merits brief and any requests for evidentiary development," explaining that such "information is necessary for any determination regarding Petitioner's ability to communicate rationally with counsel as required under *Rohan*." (*Id.* at 2.) That briefing has been completed. (Dkts. 184, 185, 186.)

## DISCUSSION

### I. *Rohan* holding

As noted above, the Ninth Circuit in *Rohan* determined that a prisoner "has a statutory right to competence in his federal habeas proceedings." 334 F.3d at 817. The "relevant question" in determining competence in the federal habeas context is "whether [the petitioner] now has the capacity to understand his position and to communicate rationally

with counsel." *Id.* at 819. Thus, "where an incompetent capital habeas petitioner raises claims that could benefit from his ability to communicate rationally, refusing to stay proceedings pending restoration of competence denies him his statutory right to assistance of counsel, whether or not counsel can identify with precision the information sought." *Id.* Accordingly, in such a situation, federal habeas proceedings "must be stayed until [the petitioner] is competent." *Id.* Finally, the Ninth Circuit was careful to note that "the mere fact that [a petitioner] does not communicate rationally does not mean that he is *incapable* of doing so." *Id.*

Other circuits have acknowledged the holding in *Rohan*, but have not been called upon to approve or reject it. *See Holmes v. Buss*, 506 F.3d 576, 578 (7th Cir. 2007); *Mines v. Dretke*, 118 Fed.Appx. 806, 812-13 (5th Cir. 2004); *see also Clayton v. Roper*, 515 F.3d 784, 790 n.2 (8th Cir. 2008). These cases distinguish between claims for which a petitioner's personal input may be beneficial and those that are "record-based or non-factual," *Rohan*, 334 F.3d at 819 n.11, or are otherwise not susceptible to the contributions of a lay person. In *Rohan*, for example, the Ninth Circuit noted that an ineffective assistance of counsel claim, which "depends in large measure on facts outside the record," could "potentially benefit from [the petitioner's] assistance." 334 F.3d at 818. The court specifically noted that ineffective assistance claims challenging counsel's performance with respect to a defendant's competence to stand trial or the gathering of mitigating evidence may be supported by information in the petitioner's "private knowledge" or from his "personal history." *Id.*; *see Hill v. Ayers*, No. 4-94-CV-641-CW, 2008 WL 683422 (N.D. Cal Mar. 10, 2008) (noting that the petitioner "has 'raised claims that could benefit from his ability to communicate rationally,' such as claims of innocence and ineffective assistance of counsel in presenting mitigating evidence at the penalty phase of his trial") (quoting *Rohan*, 334 F.3d at 818). In *Holmes*, the Seventh Circuit drew a similar distinction between claims requiring a petitioner's input and those for which his assistance is unnecessary:

> Federal habeas corpus happens to be one of the most complex areas of

- 6 -

> American law. With respect to many of the issues that arise in habeas corpus cases, a lay person has nothing to contribute to his lawyer's strategy. But it can be different with respect to other issues, several presented in this case, notably prosecutorial misconduct at trial and ineffective assistance by trial counsel. The petitioner was at his trial; his current lawyers were not. He may – if mentally competent – be able to convey to his lawyers a better sense of the alleged misbehavior of the prosecutor and of defense counsel than the trial transcript and other documentation provide.

506 F.3d at 579-80.

## II.    **Claims to which Petitioner contends *Rohan* applies**

Petitioner argues that Claims 9, 13, 17, 29, 30, and 34 may potentially benefit from his ability to communicate rationally with counsel because each are based on extra-record information that is within his personal knowledge. (Dkt. 184 at 10-15.) Petitioner also contends that there are unexhausted claims, including the thirteen claims withdrawn from his amended habeas petition (*see* Dkt. 43), as well as potential new claims that are not presently before this Court, for which his ability to assist habeas counsel is required. (Dkt. 184 at 8-9, 15-16.)

### *Claim 9*

Petitioner alleges that his Sixth and Fourteenth Amendment rights were violated because the trial judge, who was openly hostile toward Petitioner, refused to recuse himself. (Dkt. 28 at 62-64.)

#### Background

Petitioner's first trial ended in a hung jury. Before his second trial, Petitioner, acting pro se, moved to disqualify the trial judge, Judge Joseph Howe, arguing that he was biased and prejudiced against Petitioner. (ROA 104, 105.)[3] Petitioner cited adverse rulings issued by Judge Howe, particularly the denial of expert assistance on the issue of eyewitness

---

[3] "ROA" refers to the four-volume record on appeal from trial, including minute entries ("ME"), prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-92-0154-AP). "RT" refers to the court reporter's transcript. The original trial transcripts, a certified copy of the record on appeal, and a set of appellate briefs were provided to this Court by the Arizona Supreme Court. (Dkt. 23.)

- 7 -

1 identification and on-the-record comments made to Petitioner by the judge. (ROA 105.)
2 Judge Howe initially denied the motions (RT 3/25/91 at 7, 9) but thereafter vacated his ruling
3 (ME 3/25/91). The matter was then assigned to Judge Rufus Coulter, who held a hearing at
4 which Petitioner explained his position:

> [Judge Howe] is prejudicing me in alot of motions that I bring forward. He just keeps denying all my motions. And I just feel there is going to be a big effect in this next trial because he was present, and he made a lot of decisions in my last trial. And there was a lot of prejudicial remarks that he has stated to me in court on previous hearings on my motions, and he just – he just keeps determining to just take me to trial in front of him. He has stated this to me, that he will not let me go to no other judge, just in front of him. And I've made many attempts to get a change of judge, but he just calls me a fool. He don't want to listen to me, whatever I have to present to him. He says I'm just a stubborn brat. And I'm just being prejudiced. There ain't no way I'm going to get a fair trial with Judge Howe anymore.

11 (RT 5/15/91 at 3.) The prosecutor acknowledged that "there is some type of attitude problem
12 between Judge Howe and the defendant. I'm not sure why it started, how it started or what
13 effect it has had on this trial. Every time we appear in court, they snap and snarl at each
14 other. And I have no position, nor do I have any indication as to whether or not that behavior
15 will deprive the defendant of a fair trial." (*Id.* at 4.) Judge Coulter denied the motion,
16 explaining, "I snap and snarl at a lot of attorneys, but I simply don't – it doesn't mean it's
17 prejudice. Based on what has been presented, it will be ordered denying the disqualification
18 of Judge Howe." (*Id.*)

19 After his conviction in the second trial, and prior to sentencing, Petitioner filed
20 another pro se motion seeking to disqualify Judge Howe. (ROA 150.) Petitioner again cited
21 adverse rulings and the judge's disparaging courtroom comments; in addition to these
22 criticisms, Petitioner noted that he had now filed a complaint against Judge Howe with the
23 Judicial Conduct Commission. (ROA 150.) Judge Ronald Reinstein denied the motion,
24 finding that the previous allegations of bias had been ruled on and that the filing of a
25 complaint against a judge is not a basis for removal. (ME 10/1/91.)

26 On direct appeal, Petitioner's appellate counsel raised the issue of judicial bias,
27 alleging that "[t]hroughout the proceedings in this matter, the trial judge's impartiality [sic]

- 8 -

1 and bias were apparent" and citing a number of testy courtroom exchanges between Judge
2 Howe and Petitioner. (Opening Br. at 56.) The Arizona Supreme Court rejected Petitioner's
3 claim, finding that the reported exchanges between Petitioner and Judge Howe did not
4 indicate bias:

> Gonzales points to several exchanges that he claims demonstrate the judge's animosity toward him, and argues that he was denied a fair trial and sentencing. But Gonzales was a difficult litigant, and while the judge understandably became impatient with him, particularly while he was acting *pro per,* none of the exchanges would support Gonzales's claim of bias. Nor did any of the exchanges take place in front of the jury. Other than pointing to the motions the judge denied and the sentence he imposed, Gonzales has not shown how he was prejudiced. *See Liteky v. United States,* 510 U.S. 540, ----, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994) ("*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display.") We find that Judge Coulter properly denied Gonzales's motion for disqualification of Judge Howe.

*State v. Gonzales*, 181 Ariz. 502, 511-12, 892 P.2d 838, 847-48 (1995).

Analysis

In support of his contention that Claim 9 is subject to *Rohan* because it could benefit from his ability to communicate rationally with counsel, Petitioner asserts that his "substantive judicial bias claim depends on facts [outside] the record, to wit, the interaction between Petitioner and the trial court and Petitioner's observations of the trial court's interactions with others." (Dkt. 184 at 11.) The Court disagrees.

Under the AEPDA,[4] Petitioner is entitled to habeas relief on Claim 9 only if the Arizona Supreme Court's rejection of the claim constituted an unreasonable application of clearly established federal law, or if it was "based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d); *see Williams v. Taylor*, 529 U.S. 362, 407 (2000).

The record regarding this claim is complete. It includes all of the comments made by Judge Howe that Petitioner contended, in his trial motions for disqualification and on direct

---

[4] The Antiterrorism and Effective Death Penalty Act of 1996.

- 9 -

1 appeal, were indicative of judicial bias. Nevertheless, habeas counsel contend that Petitioner 2 is entitled to further development of this claim, for which Petitioner's input is required. The 3 Court disagrees. The state court record, which details the litigation of the judicial bias claim, 4 contains no suggestion that additional incidents occurred in which Petitioner made personal 5 observations of the judge's behavior; Petitioner's recusal motions cited only judicial rulings 6 and on-the-record comments that are present in the trial transcript.[5]

7 In an attempt to demonstrate that he was diligent in developing the factual basis of this 8 claim in state court (and thus is entitled to a federal evidentiary hearing on the claim), 9 Petitioner directs the Court's attention to a supplemental petition filed during state post-10 conviction ("PCR") proceedings. (ROA-PCR 500.) In this document, Petitioner now 11 contends, PCR counsel "alleged that there were additional facts not of record that required 12 development with respect to a claim of judicial bias, and he requested an evidentiary 13 hearing." (Dkt. 184 at 10.)

14 This contention is not well taken. First, the claim raised in the supplemental PCR 15 petition alleged that Arizona law failed to provide Petitioner the means of proving a claim 16 of judicial bias through voir dire of the judge (ROA-PCR 500 at 2-5), an allegation he re-17 urges in habeas Claim 41 (Dkt. 28 at 129-30). Second, in supporting the claim in state court 18 Petitioner did not, as he now asserts, "allege[] that there were additional facts not of record 19 that required development with respect to a claim of judicial bias." (Dkt. 184 at 10.) Instead, 20 Petitioner cited, as he did in all his previous judicial bias motions, on-the-record comments 21 indicating antagonism between Petitioner and the judge, as well as the fact that Judge Howe

---

[5] As the Arizona Supreme Court noted, the record also reveals that Petitioner was a contentious, even manipulative, litigant. It further shows, despite the verbal jousting between Petitioner and the court, that Judge Howe demonstrated impartiality and concern for the fairness of the trial, both in his rulings, including his decision that Petitioner's confession was inadmissible (RT 1/16/91 at 83), and in many of his comments to Petitioner reiterating the perils of proceeding without counsel. At the conclusion of a three-day hearing on Petitioner's pro se motion for a new trial, Judge Howe praised Petitioner for his thoroughly-researched and well-organized presentation. (RT 12/17/91 at 128.)

- 10 -

presided over the first trial and might therefore have been biased against Petitioner on retrial. (ROA-PCR 500 at 4.) To the extent that Petitioner alleged the existence of additional supporting evidence, it was not information gleaned from his alleged private observations of or interactions with the judge, but rather Judge Howe's feelings toward Petitioner; that is why the claim alleged a violation of Petitioner's rights based upon the lack of an opportunity to voir dire Judge Howe.[6] Under these circumstances, Petitioner was not diligent in developing this claim in state court. *See Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002) (lack of diligence because petitioner knew of and raised claims of judicial bias in state court, but failed to investigate all the factual grounds for such claims).

Petitioner's consistent failure to allege the existence of additional facts in support of his judicial bias claim, despite adequate opportunities to do so, convinces the Court that the record is fully developed and that additional, relevant facts do not exist that are within Petitioner's private knowledge. In any event, due to the lack of diligence in state court, Petitioner is not entitled to further development of the factual basis of this claim. 28 U.S.C. § 2254(e)(2); *Williams v. Taylor*, 529 U.S. 420, 437 (2000).

The Court therefore concludes that this claim cannot potentially benefit from Petitioner's ability to communicate rationally and is not subject to the holding in *Rohan*. Habeas counsel are in a position to argues the merits of this claim without further input from Petitioner.

***Claims 13 and 17***

Claim 13 alleges that Petitioner's rights under the Sixth and Fourteenth Amendments were violated by Deborah Wagner's presence in the courtroom during jury selection and after

---

[6] The claim was denied, without an evidentiary hearing, on the grounds that "Arizona law does provide such an effective means, which was used by this defendant, including the opportunity, not used, of 'voir dire' of the judge in front of another judge who holds, and in this case held, a hearing on the claim." (ME 4/21/98 at 10.)

- 11 -

her testimony.[7] (Dkt. 28 at 70-71.) Claim 17 alleges that his rights were violated by the admission of Ms. Wagner's in-court identification of Petitioner, which Petitioner claims was tainted by her exposure to him during the first trial. (*Id.* at 76-78.) In support of his argument that further input from Petitioner is necessary regarding these claims, Petitioner indicates only that "[i]f evidence is taken at an evidentiary hearing on Mrs. Wagner's courtroom behavior, Petitioner's presence and competence will be required because he was an eyewitness to her presence in the courtroom and to her reactions toward him and her interactions with others there. Petitioner must be competent to perform that role." (Dkt. 184 at 13.)

Claim 13

At Petitioner's second trial, Ms. Wagner was present for voir dire, seated in the back of the courtroom. (*See* 5/28/91 at 8 .) Subsequently, after the jury had been selected, defense counsel asked the court to inquire of the jurors whether they had been tainted by their exposure to Ms. Wagner's presence. (*Id.*) The court declined, explaining that asking such questions would "do more damage" than good and finding that there was no evidence of misconduct and that Ms. Wagner had a right under the Arizona Constitution to be present. (*Id.* at 8, 11.) The prosecutor indicated that, with respect to the remainder of the proceedings, Ms. Wagner, who had relocated to Colorado, intended to be present only for the opening statements and her own testimony – and that she would be the State's first witness. (*Id.* at 10.) Over the prosecutor's objection, however, the court did bar Ms. Wagner from the courtroom during opening statements but ruled that she could be present after her testimony. (*Id.* at 13.)

Petitioner raised this claim on direct appeal. (Opening Br. at 54.) The claim was based upon the assumption that Ms. Wagner was present in the courtroom after her testimony

---

[7] Ms. Wagner was present when her husband was stabbed to death. She was seriously injured while struggling with the assailant in the courtyard of the couple's townhouse.

– an assumption that, Petitioner conceded, was supported by nothing in the record. (*Id.* at n.19.) The Arizona Supreme Court rejected the claim:

> Gonzales argues that Deborah [Wagner's] presence in the courtroom during jury selection and her possible presence during trial after she testified prejudiced him and denied him the right to a fair trial. This argument is without merit. Deborah had a constitutional right to attend all criminal proceedings that Gonzales had the right to attend. Ariz. Const. art. 2, § 2.1(A)(3); Rule 9.3(a), Ariz.R.Crim.P. Deborah, on her own initiative, attended jury selection. She sat in the back row of the courtroom, and neither the court nor counsel knew she was there until several days later. Nor is there any evidence that prospective jurors noticed Deborah or knew who she was during jury selection. Gonzales has not shown that Deborah's presence during jury selection was prejudicial. There is no evidence that Deborah intended to or did remain in the courtroom after she testified, and therefore we consider the matter no further. *State v. Ethington,* 121 Ariz. 572, 574, 592 P.2d 768, 770 (1979).

*Gonzales*, 181 Ariz. at 512, 892 P.2d at 848.

Petitioner is entitled to relief on Claim 13 only if the Arizona Supreme Court's rejection of the claim was contrary to or based on an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). It is not apparent what information Petitioner could potentially provide that would be relevant to this determination. His personal input is not necessary to determine whether Ms. Wagner in fact continued to attend the second trial after giving her testimony, or to describe her conduct during voir dire. The record indicates, for example, that at the time of the defense request to question the jury, neither the court nor the parties, all of whom were aware of Ms. Wagner's presence during voir dire, suggested that her behavior was inappropriate.

Claim 17

At Petitioner's first trial, Ms. Wagner testified on direct examination that she thought her attacker was in the courtroom and pointed out Petitioner.[8] (RT 1/21/91 at 61.) On cross-

---

[8] Prior to trial, the court held a so-called *Desserault* hearing and determined that Ms. Wagner's exposure to a newspaper photograph was insufficient to taint her in-court identification of Petitioner. (RT 1/15/91 at 22-27.)

- 13 -

examination, however, she suggested that her identification of Petitioner had become more certain, explaining, "I didn't get any kind of feelings until I come into this courtroom yesterday and looked at the man you're trying to defend." (RT 1/22/91 at 23.) On redirect examination, Ms. Wagner did not hesitate when asked how certain she was that Petitioner was the attacker: "That man is the man that was in our house and killed us (sic)." (*Id.* at 28.) The first trial ended in a hung jury. Prior to the second trial, defense counsel moved to dismiss the charges, citing the change in the strength of Ms. Wagner's identification of Petitioner during the first trial and his concern that she was "obviously going to identify [Petitioner] as the perpetrator" at the next trial. (RT 3/25/91 at 3-4.) The court denied the motion. (*Id.* at 8.) During her testimony at Petitioner's retrial, Ms. Wagner positively identified Petitioner. (RT 5/28/91 at 59.)

Petitioner raised the allegations contained in Claim 17 on direct appeal, citing *Neil v. Biggers*, 409 U.S. 188 (1972), and *Manson v. Brathwaite*, 432 U.S. 98 (1977).[9] (Opening Br. at 25-26.) The Arizona Supreme Court held that the claim was waived because Petitioner did not object prior to trial and finding, in the alternative, that the fact that Petitioner sat at the defense table during the prior trial was not "unduly suggestive." *Gonzales*, 181 Ariz. at 510, 892 P.2d at 846.

This is a record-based claim centering on the reasonableness of the Arizona Supreme Court's decision. Petitioner does not explain how his proposed input – i.e., his personal observations of Ms. Wagner's courtroom behavior – is relevant to this Court's assessment of the Arizona Supreme Court's application of the principles announced in *Biggers* and *Brathwaite*.

---

[9] *Biggers* and *Brathwaite* establish the framework for evaluating whether an in-court identification has been irreparably tainted by a pretrial encounter between a witness and an accused. A court must determine whether the challenged pretrial encounter was suggestive and then examine the totality of the circumstances, including several specific factors, to determine whether the witness's in-court identification is nonetheless reliable. *Brathwaite*, 432 U.S. at 114 (citing *Biggers*, 409 U.S. at 199-200).

- 14 -

Petitioner now speculates, however, that a *Brady* violation occurred, with the withheld information explaining why Ms. Wagner was able to positively identify Petitioner at the second trial.[10] (Dkt. 184 at 12-13.) This contention is meritless. First, as already noted, Ms. Wagner ultimately made a positive courtroom identification of Petitioner during the first trial (RT 1/22/91 at 28), so any contention that her testimony changed from the first trial to the second is factually inaccurate. Next, Claim 17, as properly exhausted, alleges only that Ms. Wagner's identification of Petitioner was tainted and unreliable "[b]ecause of the suggestive position of [Petitioner] during the first trial, seated next to defense counsel" (Dkt. 28 at 77); it does not assert that the real explanation for Ms. Wagner's courtroom identification of Petitioner in the second trial is contained in material withheld by the State in violation of *Brady*. There is no *Brady* claim before the Court. Finally, even if, contrary to the legal and factual bases upon which Claim 17 relies, the Court were to agree that the claim somehow incorporates an allegation of a *Brady* violation, there is no indication that Petitioner's participation is required to identify or locate exculpatory material related to this issue. Therefore, the claim would not potentially benefit from Petitioner's competence.

### *Claims 29, 30, and 34*

Claims 29 and 30 challenge the sufficiency of the evidence supporting the two aggravating factors – grave risk of harm to others and pecuniary gain – found by the trial court and affirmed by the Arizona Supreme Court.[11] (Dkt. 28 at 100-03.) These are clearly record-based claims. Further evidence, including personal input from Petitioner, is not necessary because there is nothing that can be added to the facts upon which the state courts'

---

[10] Under *Brady v. Maryland*, a defendant's due process rights are violated if the prosecution fails to disclose evidence that is "material either to guilt or to punishment." 373 U.S. 83, 87 (1963).

[11] The claims also assert that Petitioner's constitutional rights were violated because the factors were found by the court rather than a jury. (*See* Dkt. 28 at 101-03.) That challenge is foreclosed by *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

findings were based. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (articulating standard for habeas review of state court's application of aggravating factor – i.e., whether any rational factfinder could have determined that the factor was proved); *Jackson v. Virginia*, 443 U.S. 319, 322 (1979) (this type of claim almost never necessitates an evidentiary hearing); *Bashor v. Risley,* 730 F.2d 1228, 1233 (9th Cir. 1984) ("Whether the evidence was sufficient . . . must be determined from a review of the evidence in the record in the *state* proceedings. No evidentiary hearing was required.").

Claim 34, which asserts that Arizona's statutory death penalty scheme unconstitutionally precludes the sentencer from considering all mitigating evidence, consists of an exclusively legal issue, for which input from a layperson is not potentially beneficial. (*Id.* at 108-09.)

### *Unexhausted claims and claims not yet raised*

Petitioner contends that the Court, in considering whether to stay the case based on Petitioner's incompetence under *Rohan*, should take into account Petitioner's capacity to assist counsel with the thirteen unexhausted claims withdrawn from his amended petition as well as potential and unnamed new claims. The Court disagrees.

<u>Background</u>

After Petitioner voluntarily withdrew the unexhausted claims from his habeas petition, he returned to state court and initiated successive PCR proceedings. The state court appointed counsel to represent Petitioner; however, before a petition was filed, Petitioner, acting pro se, requested that his second state PCR proceeding be withdrawn and his counsel dismissed so that he could proceed pro se in federal court. The state court ordered a mental health examination to determine whether Petitioner was competent to waive counsel. (*See* Dkt. 102, Ex. 3.) The court-appointed expert, Dr. Jack Potts, examined Petitioner and concluded that he was paranoid and delusional and incompetent to waive counsel. (*Id.*, Ex. 4 at 3.) Dr. Potts also reported that Petitioner refused to cooperate with him; had Petitioner

cooperated, Dr. Potts's "opinion would quite possibly have been different." (*Id.*) Based on Dr. Potts's conclusions, the court found Petitioner incompetent to waive counsel and represent himself. (*Id.*, Ex. 9.)

On the day Petitioner's successive PCR petition was due, counsel filed a motion to hold the case in abeyance until Petitioner became competent to assist counsel in the successive PCR proceeding. (Dkt. 102, Ex. 11.) The court denied the motion, finding that there was no right to a competency determination, that the claim of legal incompetency at the time of trial and sentencing was not "cognizable in a second PCR proceeding in this particular case" under Rules 32.1(e) and (h) and 32.2(b) of the Arizona Rules of Criminal Procedure, and that even if the claim was cognizable, counsel had not set forth "sufficient reasons for not raising the claim in a previous petition or in a timely manner or demonstrated why defendant's competency is essential to filing the prospective second Rule 32 proceeding." (*Id.*, Ex. 12.)

Despite this ruling, in February 2002 counsel for Petitioner filed a successive PCR petition asserting four claims, including claims that Petitioner had a right to assist counsel in a second PCR proceeding, that he was entitled to an evidentiary hearing to determine his current competency, and that he was incompetent at the time of trial and sentencing. (Dkt. 108, Ex. 1.) Counsel did not raise any of the claims withdrawn from the amended habeas petition. (*Id.*) The state court again denied the petition, explaining, with respect to the third claim, that Petitioner had failed to present a "colorable claim . . . that newly discovered evidence shows defendant was incompetent to stand trial." (*Id.*, Ex. 3.) Counsel filed a petition for review, which the Arizona Supreme Court denied. (*Id.*, Ex. 6.)

<u>Analysis</u>

As an initial matter, it is clear that a number of the thirteen withdrawn claims are record-based and resolvable as a matter of law, while others, like Claims 37, 56, and 58, are plainly meritless or non-cognizable. All of the claims, including those to which a *Rohan*

analysis may be applicable – e.g., Claim 52, alleging ineffective assistance of counsel at sentencing – remain unexhausted because they have never been presented to the state court.

Petitioner argues, pursuant to 28 U.S.C. § 2254(b)(1)(B), that Arizona's "corrective process proved to be futile because of Petitioner's incompetence in that forum and the state court's failure to stay the proceedings until Petitioner was restored," and that his "incompetence should serve to forgive the failure to exhaust in state court and permit Petitioner to supplement the amended petition with the withdrawn claims."[12] (Dkts. 184 at 4, 186 at 15.) The Court disagrees.

Petitioner was not prevented from raising in state court the thirteen claims withdrawn from his habeas petition. He noticed the claims but then failed to raise them in his second PCR petition, which instead set forth a different set of claims. Thus, counsel could have pursued and exhausted the withdrawn claims during Petitioner's successive PCR proceedings. At this point, in addition to being unexhausted, the claims are no longer before this Court. Consequently, Petitioner's competency to assist counsel with the claims is irrelevant.

Finally, counsel for Petitioner speculate that unknown evidence exists that might "support[] a colorable claim of actual innocence."[13] (Dkt. 184 at 16.) In support of this

---

[12] The Court notes that Petitioner has not moved to amend his habeas petition to include the withdrawn claims or the new claims raised in his successive PCR proceedings.

[13] Petitioner has not raised an actual innocence claim. Given the facts of the case, which include Petitioner's suppressed confession, eyewitness accounts of the attack and of his presence near the Wagner home, and circumstantial evidence of guilt, including physical evidence linking him to the crime scene and reports that, in the immediate aftermath of the attack, Petitioner returned home with various injuries and in possession of a purse matching Ms. Wagner's, the potential for successfully bringing such a claim is minimal. Similarly, taking into account the volume of the record, the nearly decade-long period between the trial and Petitioner's claims of incompetence, and the thoroughness of the amended petition, the Court views with skepticism the possible existence of undiscovered constitutional violations.

- 18 -

assertion, they argue that *Rohan* stands for the proposition that habeas proceedings must be stayed whenever a petitioner is incompetent, because a competent petitioner might have information in support of a claim of actual innocence. (*Id.*) The Court rejects this reading, which is inconsistent with the holdings of both *Rohan*, 334 F.3d at 819, and *Holmes v. Buss*, 506 F.3d at 579-80, each of which conditions the right to competence on the presence of claims that can benefit from the petitioner's ability to communicate rationally. This analytical framework would be a nullity under the interpretation advanced by Petitioner's counsel because any habeas petitioner found to be incompetent would be entitled to a stay, no matter the nature of his claims, simply by asserting that additional, hypothetical information exists that the petitioner is presently unable to share with counsel.

## CONCLUSION

Claims 9, 13, 17, 29, 30, and 34 are distinguishable from the claims discussed in *Rohan* in that their presentation in these habeas proceedings cannot benefit from Petitioner's personal input. Petitioner's properly-exhausted claims are record-based and/or resolvable as a matter of law, irrespective of Petitioner's capacity for rational communication with counsel.

In addition, as Respondents note, this case is different from *Rohan* in that Petitioner's claim of incompetence arose several years after he had filed his amended petition, which set forth the factual bases for all of his claims; it is also, unlike *Rohan*, a post-AEDPA case, so that Petitioner's claims are subject to a "substantially higher threshold for habeas relief." *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007). While these factors are not dispositive, *see Hill v. Ayers*, 2008 WL 683422, the Court believes that they support its decision not to stay these proceedings.

Finally, while the Court has found it unnecessary to determine whether Petitioner is unable, as opposed to unwilling, to communicate rationally with counsel, the Court notes that its review of the record, including the reports from Petitioner's recent stay at ASH, shows

- 19 -

that Petitioner possesses at least a limited capacity for rational communication.[14] Further, the likelihood exists that this capacity can be maximized through the use of anti-psychotic medication. Petitioner at one point availed himself of the opportunity to enhance his capacity for rational thought and communication through the use of such medication. He may choose to do so again. A contrary decision will not, however, for the reasons set forth above, forestall these proceedings.

Based on the foregoing,

**IT IS HEREBY ORDERED** that Petitioner's Motion for Competency Determination and to Stay Proceedings (Dkt. 102) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner shall file his Merits Memorandum (*see* Dkt. 97) no later than June 20, 2008.

**IT IS FURTHER ORDERED** that if, pursuant to LRCiv 7.2(g), Petitioner or Respondents file a Motion for Reconsideration of this Order, such motion shall be filed within **fifteen (15) days** of the filing of this Order. The filing and disposition of such motion does not toll the time for the filing of the Merits Memorandum.

DATED this 23rd day of April, 2008.

*[signature]*
Stephen M. McNamee
United States District Judge

---

[14] While Petitioner refused to meet with counsel in order to facilitate the progress of these proceedings, he did agree to meet with mental health experts in support of his motion to determine competency and stay the proceedings. As discussed above, Petitioner was at times able to communicate rationally with Drs. Scherzer and Seward.