**WO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ernest Valencia Gonzales, | No. CV-99-2016-PHX-SMM |
| Petitioner, | |
| v. | **O R D E R** |
| | <u>DEATH PENALTY CASE</u> |
| Charles L. Ryan, et al., | |
| Respondents. | |

Before the Court is Petitioner's First Amended Habeas Petition. (Doc. 28.) Petitioner filed a memorandum addressing the merits of his claims and requesting evidentiary development. (Doc. 214.) Respondents filed a response to the memorandum and Petitioner filed a reply. (Docs. 217, 220.) For the reasons set forth herein, Petitioner is entitled to neither habeas relief nor evidentiary development.

## BACKGROUND

In 1991, Petitioner was convicted by an Arizona jury of felony murder, armed robbery, aggravated assault, first-degree burglary, and theft. The trial court sentenced Petitioner to death on the murder charge and to various prison terms for the other crimes. The Arizona Supreme Court summarized the facts of the crimes as follows:

Shortly before 7:00 p.m. on February 20, 1990, Roger Daughtry returned home from work and noticed that his porch light was on. He went inside and saw that someone had disassembled his stereo and moved his speakers. Suddenly, a man appeared from behind the speakers, looked at Daughtry, and ran out of the house. Daughtry later identified that man as Ernest Gonzales.

Minutes later, Jeri Sheer, Daughtry's neighbor, took out her trash with her dog, which ran toward a man holding what looked like a tire iron. Sheer looked at the man, grabbed her dog, and went back into her house. When she looked out the window, she noticed the man heading west, the direction of Darrel and Deborah Wagner's townhouse. Sheer later identified the man as Gonzales.

About 7:10 p.m., Darrel Wagner, his wife Deborah, and Deborah's seven-year-old son arrived home from dinner. As they walked into the small courtyard of their townhouse, they noticed that their front door was ajar. Darrel went to investigate while Deborah and her son waited at the gate. As Darrel pushed open the front door, both he and Deborah saw Gonzales standing on the stairway holding their VCR under his arm. Deborah immediately told her son to run to the neighbor's house and call 911. When she turned back toward her home, she saw Gonzales shove her husband out the front door. Darrel lost his balance and fell backward. Gonzales began to stab him repeatedly (seven times in all).

Deborah pleaded with Gonzales to leave. When he did not, Deborah jumped on Gonzales's back and wrapped her arms around him to keep him from stabbing Darrel. Gonzales then swung at Deborah and stabbed her twice. He also apparently wounded himself as he was flailing at Deborah. When Deborah fell off his back, Gonzales left with her purse. A few minutes later, Darrel helped his wife up and both went inside to call 911. Darrel collapsed on the floor during the call and died later that night. Deborah spent five days in intensive care.

Gonzales went from the Wagner residence to his girlfriend [Gloria Alvarez's] house. She helped clean his wound. Her daughters, Catherine and Martha Trinidad, were there and testified at trial about comments Gonzales made the night of the murder, his clothing, and the "bag" he had with him containing a woman's driver's license and pictures of a boy with red hair—the color of Deborah's son's hair.

*State v. Gonzales*, 181 Ariz. 502, 506, 892 P.2d 838, 842 (1995).

Petitioner was represented at trial by appointed counsel. Following a mistrial, Petitioner requested, and the Court granted, his motion to represent himself. Petitioner subsequently withdrew his *pro per* request and original trial counsel was reappointed to represent Petitioner during the second trial that led to his conviction.

Thereafter, Petitioner's counsel filed a motion for a new trial. (ROA 131.)[1] In response, Petitioner filed a new motion to proceed *pro per* and a motion to strike counsel's motion for a new trial, both of which were granted. (*Id.* 134, 135; ROA-ME 68.) Petitioner also filed a supplemental motion for a new trial, which included numerous claims of ineffective assistance of trial counsel. (ROA 138.) The trial court held a three-day hearing, at which Petitioner's ineffective assistance allegations were considered and denied.

Petitioner filed a petition for post-conviction relief (PCR) and a supplemental petition. (ROA-PCR 441, 499, 500.) The trial court denied the petitions and denied a motion for rehearing. (ROA-PCR 518, Ex's. D, E.) Petitioner filed a petition for review, which the Arizona Supreme Court denied in October 1999. (*See* ROA-PCR 517).

On November 15, 1999, Petitioner commenced these proceedings by filing a *pro forma* petition for a writ of habeas corpus. (Doc. 1.) The Court appointed the Federal Public Defender's Office as counsel. (Doc. 8.) On December 27, 1999, the Court issued a case management order setting a deadline for the filing of an amended petition. (Doc.

---

[1] "ROA" refers to the four-volume record on appeal from trial and sentencing, including minute entries (ME) prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-92-0154-AP). "ROA-PCR" refers to the 11-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-98-0422-PC).

17.) The order required the amended petition to "include every known constitutional error or deprivation entitling Petitioner to habeas relief" and to provide a "Statement of Exhaustion" noting where each claim for relief was raised in state court. (*Id.* at 2.)

On July 17, 2000, Petitioner filed a 237-page amended petition raising 60 claims for relief. (Doc. 28.) He failed, however, to file the required Statement of Exhaustion. The Court directed Petitioner to comply with its case management order. (Doc. 34.) On September 14, 2000, Petitioner notified the Court that he had filed a petition for writ of mandamus in the Ninth Circuit Court of Appeals. (Doc. 35.) The Court denied Petitioner's request for a stay of the proceedings and for additional time to file the Statement of Exhaustion. (Doc. 40.)

On October 6, 2000, Petitioner filed the Statement of Exhaustion. (Doc. 42.) He simultaneously filed a notice of withdrawal of claims, voluntarily withdrawing 13 unexhausted habeas claims, including claims alleging ineffective assistance of counsel. (Doc. 43.) The notice indicated that Petitioner had initiated a PCR proceeding in state court to exhaust the withdrawn claims, but did not request a stay of the federal proceedings. (*Id.* at 2.) On October 16, 2000, the Ninth Circuit denied the mandamus petition as moot.

In February 2001, Petitioner requested that his PCR counsel be removed and that he be permitted to represent himself in his successive PCR proceeding. (Doc. 102-1 at 3–5.) The state court ordered a mental health examination to determine whether Petitioner was competent to waive counsel. (*Id.* at 6–7.) A court-appointed expert determined that

Petitioner was paranoid and delusional. (*Id.* at 10.) In August 2001, the state court found Petitioner incompetent to waive counsel and represent himself. (*Id.* at 26.)

In December 2001, on the day Petitioner's successive PCR petition was due, counsel filed a motion to hold the case in abeyance pending restoration of Petitioner's competency. (Doc. 102-1 at 30–36.) The motion asserted that Petitioner's inability to rationally communicate with counsel precluded counsel from developing a claim of incompetency at the time of trial and sentencing. (*Id.*) The state court denied the motion. (*Id.* at 45.)

In February 2002, state counsel filed a successive PCR petition asserting four claims, including claims that Petitioner had a right to be competent to assist counsel in a second PCR proceeding, that he was entitled to an evidentiary hearing to determine his current competency, and that he was incompetent at the time of trial and sentencing. (Doc. 108-1 at 3–24.) PCR counsel did not raise any of the claims withdrawn from the amended federal habeas petition. (*Id.*) The state court denied the petition, and the Arizona Supreme Court denied a petition for review. (*Id.* at 40; Doc. 108-2 at 6.)

Following Petitioner's withdrawal of the 13 unexhausted claims in October 2000, the parties briefed the procedural status of Petitioner's remaining habeas claims. Briefing concluded in February 2001. (Doc. 59.) The procedural status of Petitioner's claims remained under advisement until September 2002, when the Court stayed Petitioner's sentencing-related claims pending exhaustion in state court of a claim based on the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). (Doc. 75.) Petitioner initiated another state PCR proceeding. The state court consolidated it with

1
2
3
4

the already-pending PCR petition. The Arizona Supreme Court denied review in October 2003. (Doc. 81.) In July 2004, following the United States Supreme Court's decision in *Schriro v. Summerlin*, 542 U.S. 348 (2004), this Court lifted the stay.

5
6
7
8

Over the next 18 months, while the matter was under advisement, Petitioner did not seek amendment to reincorporate the 13 withdrawn claims or to add the claims litigated in the second PCR petition.

9
10
11
12
13

On January 12, 2006, the Court entered its order regarding the procedural status of Petitioner's habeas claims. (Doc. 97.) The Court dismissed some of the claims on procedural grounds or as plainly meritless, and established a deadline for Petitioner to submit briefing on the merits of the remaining claims. (*Id.*)

14
15
16
17
18
19

On the eve of the deadline for filing his merits brief, Petitioner's counsel instead moved to stay this action pursuant to *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003), *abrogated by Ryan v. Gonzales*, 133 S. Ct. 696 (2013), contending that Petitioner was incapable of rationally communicating with or assisting habeas counsel. (Doc. 102.)

20
21
22
23
24
25

After two years of litigation regarding Petitioner's competency, the Court entered an order on April 23, 2008, denying Petitioner's motions for a competency hearing and a stay of these proceedings.[2] (Doc. 187.) The Court determined that Petitioner's remaining claims were record-based or involved purely legal issues and therefore would not benefit

26
27
28

---

[2] During this period the Court granted Petitioner's motion that he be transferred to the Arizona State Hospital for an extended mental health assessment. (*See* Doc. 187 at 3–4.) Petitioner was prescribed an anti-psychotic medication which improved capacity for rational thought. (*Id.* at 4.) However, Petitioner voluntarily discontinued treatment, complaining of back pain. (*Id.*)

- 6 -

from Petitioner's ability to communicate rationally with counsel. (*Id.*) Petitioner filed an emergency petition for writ of mandamus with the Ninth Circuit, which issued a stay on June 19, 2008. (Doc. 199.) The Ninth Circuit subsequently granted mandamus. *In re Gonzales*, 623 F.3d 1242 (9th Cir. 2010). On January 8, 2013, the United States Supreme Court reversed. *Gonzales*, 133 S. Ct. at 696. The case was returned to this Court on June 6, 2013. (Doc. 206.)

The Court ordered Petitioner to file his merits brief no later than September 20, 2013. (Doc. 208.) Instead, Petitioner filed a motion for recusal/reassignment, which the Court denied. (Docs. 210, 211.) Petitioner then filed an emergency motion with the Ninth Circuit panel to stay the proceedings, as well as a petition for a writ of mandamus and a motion for reassignment of the case. On September 30, 2013, the Ninth Circuit panel denied the mandamus petition and denied the stay. (Doc. 216.)

Petitioner filed his merits memorandum on September 20, 2013. (Doc. 212; *see* Docs. 213, 214, 215.) Briefing was completed on November 22, 2013. (Doc. 220.)

In February 2014, Petitioner filed a motion to amend, seeking to add eight claims of ineffective assistance of counsel, including ineffective assistance at sentencing. (Doc. 228.) The Court denied the motion (Doc. 234) and now addresses the remainder of Petitioner's claims.

## **APPLICABLE LAW**

Federal habeas claims are analyzed under the framework of the Antiterrorism and

Effective Death Penalty Act ("AEDPA").[3] Pursuant to 28 U.S.C. § 2254(d), a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). In *Harrington v. Richter*, 562 U.S. 86 (2011), the Court clarified that under § 2254(d), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101. Accordingly, to obtain habeas relief from this Court, Petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see Frost v. Pryor*, 749 F.3d 1212, 1225–26 (10th Cir. 2014) ("[I]f all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable . . . If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied.").

---

[3] Petitioner's challenge to the constitutionality of the AEDPA is meritless. *See Crater v. Galaza*, 491 F.3d 1119, 1125–26 (9th Cir. 2007) (holding that AEDPA violates neither the Suspension Clause nor separation of powers).

With respect to § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice v. Collins*, 546 U.S. 333, 341–42 (2006); *see Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (explaining that on habeas review a court "cannot find that the state court made an unreasonable determination of the facts . . . simply because we would reverse in similar circumstances if this case came before us on direct appeal").

To find that a factual determination is unreasonable under § 2254(d)(2), the court must be "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). "This is a daunting standard—one that will be satisfied in relatively few cases." *Id.*

Significantly, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (holding that "the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court"); *see Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) ("Along with the significant deference

AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). The Ninth Circuit has observed that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well." *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (2013) (citing § 2254(d)(2) and *Pinholster*, 131 S. Ct. at 1400 n.7). Therefore, as the court explained in *Gulbrandson*:

> for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d). This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d).

*Id.* at 993–94.

### **ANALYSIS**

Twenty-five claims remain from the first amended petition. Petitioner seeks evidentiary development on each. However, because the claims were denied on the merits in state court, this Court's review is limited to the state court record and Petitioner is entitled to evidentiary development only if a claim satisfies § 2254(d).[4] *Pinholster*, 131 S. Ct. at 1398, 1400–01; *see, e.g.*, *Henry v. Ryan*, 720 F.3d 1073, 1093 n.15 (9th Cir. 2013) (explaining that *Pinholster* bars evidentiary hearing unless petitioner satisfies § 2254(d)).

---

[4] Claims 45, 47, and 48, alleging ineffective assistance of counsel, were not considered on the merits in state court. However, the existing record is sufficient to resolve the claims and evidentiary development is unnecessary. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (explaining that an evidentiary hearing is unnecessary when the state-court record "precludes habeas relief" under § 2254(d) limitations).

As discussed next, relief on each of the claims is precluded by § 2254(d), so Petitioner's requests for evidentiary development must be denied.[5]

**Claim 4**

Petitioner alleges that the photographic lineup shown to witnesses Roger Daughtry and Jeri Scheer was impermissibly suggestive and unreliable, and therefore their testimony identifying Petitioner should not have been admitted at trial.[6] (Doc. 214 at 42–48.)

Before trial, Petitioner moved to suppress the identifications. The court conducted a "*Dessureault* hearing"[7] and concluded that there was "no evidence at all of undue suggestion." (ME 132.) The identifications were admitted at trial. On direct appeal, the Arizona Supreme Court agreed that the identifications were admissible. *Gonzales*, 181 Ariz. at 509–10, 892 P.2d at 845–46.

A pretrial identification violates due process where (1) the police-arranged identification procedure is impermissibly suggestive, and (2) the suggestive procedure

---

[5] Throughout his memorandum on the merits, Petitioner asserts that his incompetence prevents him from further developing his claims. (*See, e.g.*, Doc. 212 at 1, 40, 48.) For the reasons discussed in previous orders (Docs. 187, 235), and because Petitioner is not entitled to evidentiary development under *Pinholster*, his competence is not at issue in the resolution of his claims for habeas relief. While it is unnecessary at this point in the proceedings to address questions concerning Petitioner's competency, the Court recognizes that the issue may arise if and when the State obtains a warrant of execution.

[6] Daughtry, when shown the lineup three days after witnessing the burglary, chose Petitioner's photo as the "most likely" or "most like the person." (RT 1/17/90 at 9–10.) Scheer picked out Petitioner's photo when she was shown the lineup a week after the incident. (*Id.* at 25–28.) She was 80 percent certain the photo showed the person she had seen outside her home. (*Id.* at 28.) Deborah Wagner was unable to identify her attacker in the photo lineup. (*See* RT 1/22/91 at 24–27; RT 5/28/91 at 108–111.)

[7] *State v. Dessureault*, 104 Ariz. 380, 384, 453 P.2d 951 (1969), directs trial courts to hold an evidentiary hearing when a proposed in-court identification is challenged.

- 11 -

gives rise to a very substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 197 (1972); *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977). "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 132 S. Ct. 716, 718 (2012) (citing *Braithwaite*, 432 U.S. at 107). Factors to be considered in assessing the reliability of the identification include the opportunity of the witness to view the suspect at the time of the crime, the witness's degree of attention, the accuracy of the witness's description, the level of certainty, and the lapse of time between the crime and the identification. *Biggers*, 409 U.S. at 199–200.

Petitioner contends that the photographic lineup shown to Daughtry and Scheer was improperly suggestive because Petitioner's photo, one of five in the lineup, has a lighter background than the other photos and because the other men pictured "have normal facial expressions while Mr. Gonzales has his eyes squinted and effectuates a hostile glare." (Doc. 214 at 42–43.) The Arizona Supreme Court addressed this argument and concluded that the line-up was not unduly suggestive:

> To establish a due process violation, Gonzales must first establish that the circumstances surrounding the pretrial identification "were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," *Simmons v. United States*, 390 U.S. 377, 384 (1968), and that the "state bore sufficient responsibility for the suggestive pretrial identification." *See State v. Williams,* 166 Ariz. 132, 137, 800 P.2d 1240, 1245 (1987). Gonzales argues that the line-up was suggestive because (1) the background in his photo was lighter than the others, (2) he had a "hostile glare" that gave him a more "criminal look," (3) only three of the men in the line-up had "bushy" mustaches while the others had only thin mustaches, and (4) both Sheer and Daughtry knew that a suspect had been arrested before they viewed the photos.

1
2
3
4
5
6
7

> After reviewing the photographic line-up shown to Sheer and Daughtry, we conclude that the trial court did not err in holding that it was not impermissibly suggestive. While upon close examination, the lighting or flash may be brighter in Gonzales's picture, the difference is almost imperceptible. All the persons shown stood against a solid white background. The facial expression Gonzales chose while being photographed was not a function of police conduct. Nor will different facial expressions or hair thickness render a line-up impermissibly suggestive. There is no requirement that the accused be surrounded by nearly identical persons.

8

*Gonzales*, 181 Ariz. at 509–10, 892 P.2d at 845–46 (additional citations omitted).

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

The Arizona Supreme Court's decision was not based on an unreasonable application of clearly established federal law or an unreasonable determination of the facts. "When a witness identifies the defendant in a police-organized photo lineup . . . , the identification should be suppressed only where 'the photographic identification procedure was so [unnecessarily] suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Perry*, 132 S. Ct. at 724 (quoting *Simmons v. United States,* 390 U.S. 377, 384–85 (1968)). That is not the case here. The photo lineup shows five young Hispanic males with dark hair and mustaches. *See United States v. Beck*, 418 F.3d 1008, 1012 (9th Cir. 2005) (finding no impermissible suggestion where the photospread showed six pictures of clean-shaven "Caucasian males in the same age range with similar skin, eye, and hair coloring"); *United States v. Carabajal*, 956 F.2d 924, 929 (9th Cir. 1992) (finding no impermissible suggestion where the photospread showed six pictures of "Hispanic males in the same age range, with similar skin, eye, and hair coloring" as well as similar hair length and facial hair).

28

The Ninth Circuit has explained that "insubstantial differences between the

defendant's photograph and the others do not in themselves create an impermissible suggestion." *United States v. Burdeau*, 168 F.3d 352, 357 (9th Cir. 1999). In *Burdeau*, the court held that a photo array was not suggestive even though the defendant's picture was placed in the center of the array, was "darker than the rest," and was the only one showing a person with closed eyes. *Id.*; *see United States v. Johnson*, 820 F.2d 1065, 1073 (9th Cir. 1987) (finding photographic array was not impermissibly suggestive when defendant's photograph was hazier than others); *United States v. Sambrano*, 505 F.2d 284, 286 (9th Cir. 1974) (finding photographic array in which defendant's photograph was darker and clearer was not impermissibly suggestive).

Neither Petitioner's facial expression nor the fact that his photo was slightly lighter than the others is a substantial difference that renders the lineup impermissibly suggestive. The Arizona Supreme Court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts. Claim 4 is denied.

**Claim 5**

Petitioner alleges that his confrontation and due process rights were violated by the trial court's failure to appoint various experts. (Doc. 214 at 48–54.)

Before the second trial, Petitioner moved for the appointment of experts in serology, fingerprinting, and identification. (ROA 171.) The trial court denied the motion, explaining, "I don't see the change in the trial warranting the appointment of new experts and changing the dynamic at all. It's just another trial. That jury hung up, and, as I said when I mistried it before, we'll just try it again. And in view of that, there's nothing

new." (RT 3/25/91 at 6.)

On appeal, Petitioner argued that that the trial court's refusal to appoint the experts denied him due process under *Ake v. Oklahoma*, 470 U.S. 68 (1985). The Arizona Supreme Court held that Petitioner had failed to make a threshold showing of "reasonable necessity" as required under *Ake* and the state statute governing the appointment of experts. *Gonzales*, 181 Ariz. at 511, 892 P.2d at 847. The court found that Petitioner "did not explain how a fingerprint expert would be helpful, let alone necessary, to his defense. The state did not offer fingerprint evidence against him." *Id.* The court also noted that Petitioner "made only general references to the credibility of Deborah's identification testimony to support his request for a serologist and an identification expert." *Id.* Finally, the court explained that "it does not appear that the identification expert testimony would have been admissible under [state law]." *Id.* at n.4.

The Arizona Supreme Court did not unreasonably apply clearly established federal law. In *Ake*, the United States Supreme Court held that a defendant has a constitutional right to the appointment of a psychiatrist when his sanity is a "significant factor at trial." 470 U.S. at 83. However, the Supreme Court has declined to consider whether the holding in *Ake* extends beyond psychiatrists to other expert witnesses and investigators. *See Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985) ("We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to [a criminal investigator, a fingerprint expert, or a ballistics expert]."). The Ninth Circuit has limited the *Ake* holding to psychiatrists and specifically held that *Ake* does not extend to eyewitness identification experts. *Jackson v. Ylst*, 921

1   F.2d 882, 886 (9th Cir. 1990). Therefore, Petitioner's claim fails because the Supreme

2   Court has not clearly established a constitutional right to the appointment of forensic

3

4   experts. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from

5   [the Supreme] Court regarding [the petitioner's claim], it cannot be said that the state

6

7   court unreasonably applied clearly established Federal law.") (internal quotation marks

8   and brackets omitted).[8]

9       Claim 5 is denied.

10  **Claim 7**

11

12      Petitioner alleges that his right to testify and his right to due process were violated

13  when the trial court ruled that the prosecution could use his statements to the police for

14  impeachment purposes if he chose to testify. (Doc. 214 at 57.) Petitioner contends that

15

16  the statements, made while he was being treated in the hospital for an injury he received

17  during his arrest, were involuntary and therefore inadmissible for all purposes.

18      Background

19

20      The trial court held a voluntariness hearing before Petitioner's first trial. Phoenix

21  Detectives Michael Chambers and Billy Butler testified. Petitioner did not.

22      Petitioner was arrested in the early morning hours of February 23, 1990. He was

23

24  fleeing on foot from a traffic stop when an officer struck him in the head with a

25

26      [8] Even if *Ake* extended to the type of experts sought by Petitioner, the Arizona
    Supreme Court reasonably determined that Petitioner failed to show there was a necessity
27  for their appointment in his case. The State did not use fingerprint evidence against
    Petitioner. Petitioner offered no specific support for his request for a serology expert (*see*
28  ROA 171), and under Arizona law the general rule is that "the trier of facts needs no
    assistance from expert testimony on the question of reliability of identification." *State v.
    Chapple*, 135 Ariz. 281, 296, 660 P.2d 1208, 1223 (1983).

flashlight, knocking him to the ground. (RT 6/3/91 at 91.) Petitioner sustained an injury above his right eye. (*Id.* at 92–93.)   Before Petitioner was transported to the county medical center at 6:47 a.m., Detective Butler advised him of his *Miranda* rights.[9] (RT 1/16/91 at 61–62.) Petitioner indicated that he understood his rights. (*Id.* at 62.) When asked if he would like to give his side of the story, Petitioner responded that he had nothing to say. (*Id.*)

Later that morning, when Detective Chambers arrived at the homicide office, his supervisor asked him to relieve one of the two uniformed officers who were guarding Petitioner at the medical center. (*Id.* at 66–67.) When Chambers arrived at the hospital about 9:00 a.m., Petitioner was on a hospital bed while a physician was cleaning soil out of a deep laceration on Petitioner's forehead. (*Id.* at 68–69, 76.) Petitioner complained about pain, but also said that pain was good because it kept his head clear. (*Id.* at 78.)

Detective Chambers again asked Petitioner whether he understood his rights, but he did not re-administer the *Miranda* warnings. (*Id.* at 70.) Petitioner indicated that he understood his rights and stated that he did not want to talk about his arrest until he had spoken with an attorney. (*Id.*) Detective Chambers offered to place a call, but Petitioner did not provide the name of an attorney. (*Id.*)

Chambers continued speaking with Petitioner. Noting that Petitioner had a record as a burglar, not a violent criminal, Detective Chambers suggested a scenario in which Petitioner did not intend to harm anyone but only attacked Mr. Wagner because Wagner confronted him during the burglary and attempted to prevent his escape. (*Id.* at 71, 75.)

---

[9] *Miranda v. Arizona*, 384 U.S. 436 (1966).

1
2
3
4

Petitioner acknowledged that Detective Chambers' description of the incident was correct. (*Id.* at 71–72.) He also indicated that he had been struck in the head during the confrontation and that he did not intend to harm the woman. (*Id.* at 72, 75.)

5
6
7
8
9
10
11
12
13
14
15
16

The trial court found that the statements were taken in violation of Petitioner's rights under *Miranda* and precluded their use in the State's case-in-chief. However, the court ruled that the statements would be admissible for impeachment purposes if Petitioner were to testify. (RT 1/16/91 at 82–83.) Citing *Harris v. New York*, 401 U.S. 222 (1971), the court explained that "[a] statement plainly taken without giving *Miranda* rights nevertheless becomes admissible to impeach if it is fundamentally competent. And here, the issue of the competence of the defendant, based on his injury and so forth, would go to the weight, not the admissibility. So to that extent suppression is denied." (*Id.* at 82.)

17
18
19
20
21

On appeal, Petitioner argued that under *Mincey v. Arizona*, 437 U.S. 385, 398 (1978), the statements should have been excluded for all purposes because his medical condition at the time rendered the statements involuntary. He also contended that the trial court's ruling prevented him from taking the stand in his own defense.

22
23
24
25
26
27
28

The Arizona Supreme Court denied the claim, holding that Petitioner's statements were voluntary:

> Our inquiry is whether the confession was the product of "a rational intellect and a free will." *Mincey*, 437 U.S. at 398. Gonzales was in the hospital having his wound cleaned. He was not strapped down, sedated, or incoherent. In fact, he stated that the pain from his wound "kept his head clear." Gonzales understood and responded to the questions and even asked questions about statements he believed his girlfriend had made. Gonzales's will was not overborne. This case is not like *Mincey* where the defendant

was in intensive care, confined to bed, in extreme pain, heavily sedated, confused, incoherent, and eventually unconscious. Gonzales's statements were not coerced. The trial court did not err in ruling them admissible to impeach.

*Gonzales*, 181 Ariz. at 512–13, 892 P.2d at 848–49 (additional citations omitted).[10] This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

Analysis

While a statement taken in violation of defendant's *Miranda* rights may not be used in the prosecution's case in chief, it is admissible for impeachment so long as "the trustworthiness of the evidence satisfies legal standards." *Harris*, 401 U.S. at 224. Any use of a defendant's involuntary statement is a denial of due process. *Mincey*, 437 U.S. at 398.

To determine whether a statement was voluntary, a court considers whether, under "the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). A statement is involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U.S. 532, 542–43 (1897)).

---

[10] The Arizona Supreme Court also found that Petitioner had waived the claim by failing to testify, *Gonzales*, 181 Ariz. at 512, 892 P.2d at 848, but this Court held that the procedural ruling was not adequate to bar habeas review. (Doc. 97 at 13.)

There is no evidence that Petitioner's statements were extracted by threats, violence, promises, or the exertion of improper influence. He was not subjected to violence, promised leniency in exchange for making a statement, or lied to.

As the Arizona Supreme Court observed, the circumstances in which he made his statements bear little resemblance to those in *Mincey*, where "[t]he statements at issue were . . . the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness." *Mincey*, 437 U.S. at 400.

Mincey had been seriously injured in a shootout with police, sustaining a wound in his hip, which resulted in damage to the sciatic nerve and partial paralysis of his right leg.[11] 437 U.S. at 396. When he arrived at the hospital, he was "depressed almost to the point of coma." *Id.* at 398. Tubes were inserted into his throat and through his nose into his stomach, and a catheter was inserted into his bladder. *Id.* at 396. He was unable to speak, and had to write out his answers to the detective's questions. *Id.*

While Mincey was in the intensive care unit, in a "debilitated and helpless condition," a detective arrived and, after administering the *Miranda* advisory, proceeded to interrogate Mincey over the course of four hours. *Id.* The United States Supreme Court described the interrogation:

> As soon as [Detective] Hust's questions turned to the details of the afternoon's events, Mincey wrote: "This is all I can say without a lawyer." Hust nonetheless continued to question him, and a nurse who was present suggested it would be best if Mincey answered. Mincey gave unresponsive or uninformative answers to several more questions, and then said again that he did not want to talk without a lawyer. Hust ignored that request and another made immediately thereafter. Indeed, throughout the interrogation

---

[11] Mincey remained hospitalized for almost a month. 437 U.S. at 398 n.14.

Mincey vainly asked Hust to desist. Moreover, he complained several times that he was confused or unable to think clearly, or that he could answer more accurately the next day. But despite Mincey's entreaties to be let alone, Hust ceased the interrogation only during intervals when Mincey lost consciousness or received medical treatment, and after each such interruption returned relentlessly to his task.

*Id.* at 399–401 (footnotes omitted). The Court concluded that "[i]t is hard to imagine a situation less conducive to the exercise of 'a rational intellect and a free will' than Mincey's." *Id.* at 398 (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)).

Petitioner, unlike Mincey, was not in a debilitated condition, physically or mentally, when he made his statements to Detective Chambers. While Petitioner was in pain and being treated for a laceration on his forehead, he was, by his own account, able to think clearly. He was not confused, passing into and out of consciousness, or offering incoherent statements to his interrogator.

Detective Chambers' conduct was not coercive or overbearing. Although Petitioner was in pain as his laceration was being treated, "it was not so severe as to render him unable to make a voluntary statement or unduly susceptible to manipulation by his interrogator[]." *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) (upholding district court's voluntariness finding where defendant was in intensive care with knife wound but was "alert and awake despite his pain"); *see United States v. Khalil*, 214 F.3d 111, 115, 121–22 (2d Cir. 2000) (finding statement voluntary where defendant was in hospital, suffering from a gunshot wound and awaiting surgery). Under the totality of the circumstances, Petitioner's inculpatory statements were not the product of unconstitutional coercion, and his will was not overborne. Claim 7 is denied.

1

**Claim 9**

2

3        Petitioner alleges that his Sixth and Fourteenth Amendment rights were violated

4    because the trial judge was openly hostile toward Petitioner and refused to recuse

5    himself. (Doc. 214 at 64.)

6        Background

7        Petitioner's first trial ended in a hung jury. Before his second trial, Petitioner,

8    acting *pro per*, moved to disqualify the trial judge, Judge Joseph Howe, arguing that he

9    was biased and prejudiced against Petitioner. (ROA 104, 105.) Petitioner cited adverse

10    rulings issued by Judge Howe, particularly the denial of expert assistance on the issue of

11    eyewitness identification, and on-the-record comments made by the judge to Petitioner.

12    (ROA 105.)

13
        Judge Howe initially denied the motions (RT 3/25/91 at 7, 9) but subsequently

14    vacated his ruling (ME 3/25/91). The matter was then assigned to Judge Rufus Coulter,

15    who held a hearing at which Petitioner explained his position:

16

17        [Judge Howe] is prejudicing me in a lot of motions that I bring forward. He
         just keeps denying all my motions. And I just feel there is going to be a big
18       effect in this next trial because he was present, and he made a lot of
         decisions in my last trial. And there was a lot of prejudicial remarks that he
19       has stated to me in court on previous hearings on my motions, and he just—
         he just keeps determining to just take me to trial in front of him. He has
20       stated this to me, that he will not let me go to no other judge, just in front of
         him. And I've made many attempts to get a change of judge, but he just
21       calls me a fool. He don't want to listen to me, whatever I have to present to
         him. He says I'm just a stubborn brat. And I'm just being prejudiced. There
22       ain't no way I'm going to get a fair trial with Judge Howe anymore.

23

24

25

26

27    (RT 5/15/91 at 3.)

28
        The prosecutor acknowledged that "there is some type of attitude problem

- 22 -

between Judge Howe and the defendant. I'm not sure why it started, how it started or what effect it has had on this trial. Every time we appear in court, they snap and snarl at each other. And I have no position, nor do I have any indication as to whether or not that behavior will deprive the defendant of a fair trial." (*Id.* at 4.) Judge Coulter denied the motion, explaining, "I snap and snarl at a lot of attorneys, but I simply don't—it doesn't mean it's prejudice. Based on what has been presented, it will be ordered denying the disqualification of Judge Howe." (*Id.*)

After his conviction in the second trial but prior to sentencing, Petitioner filed another *pro se* motion seeking to disqualify Judge Howe. (ROA 150.) Petitioner again cited adverse rulings and the judge's disparaging courtroom comments. In addition to these criticisms, Petitioner noted that he had filed a complaint against Judge Howe with the Judicial Conduct Commission. (ROA 150.) Judge Ronald Reinstein denied the motion, finding that the previous allegations of bias had been ruled on and that the filing of a complaint against a judge is not a basis for removal. (ME 10/1/91.)

On direct appeal, Petitioner's appellate counsel raised the issue of judicial bias, alleging that "[t]hroughout the proceedings in this matter, the trial judge's impartiality [sic] and bias were apparent" and citing a number of contentious exchanges between Judge Howe and Petitioner. (Opening Br. at 56.) The Arizona Supreme Court rejected Petitioner's claim, finding that the reported exchanges between Petitioner and Judge Howe did not indicate bias:

> Gonzales points to several exchanges that he claims demonstrate the judge's animosity toward him, and argues that he was denied a fair trial and sentencing. But Gonzales was a difficult litigant, and while the judge

- 23 -

understandably became impatient with him, particularly while he was acting *pro per,* none of the exchanges would support Gonzales's claim of bias. Nor did any of the exchanges take place in front of the jury. Other than pointing to the motions the judge denied and the sentence he imposed, Gonzales has not shown how he was prejudiced.

*Gonzales*, 181 Ariz. at 511–12, 892 P.2d at 847–48. Citing *Liteky v. United States,* 510 U.S. 540, 555 (1994), the court concluded "that Judge Coulter properly denied Gonzales's motion for disqualification of Judge Howe." *Id.* at 512, 892 P.2d at 848.

Analysis

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge. *See In re Murchison*, 349 U.S. 133, 136 (1955); *Rhoades v. Henry*, 598 F.3d 511, 519 (9th Cir. 2010) ("Due process requires that trials be conducted free of actual bias as well as the appearance of bias."). Judicial bias reaching the level of a due process violation, and therefore requiring recusal, is presumed in cases "in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Due process also requires recusal "if the judge acts as 'part of the accusatory process.'" *Crater v. Galaza*, 491 F.3d 1119, 1132 (9th Cir. 2007) (quoting *Murchison*, 349 U.S. at 137). "To succeed on a judicial bias claim, however, the petitioner must overcome a presumption of honesty and integrity in those serving as adjudicators.'" *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (quoting *Withrow*, 421 U.S. at 47).

In *Liteky*, the Supreme Court explained that a judge's conduct at trial may be "characterized as bias or prejudice" only if "it is so extreme as to display clear inability to

render fair judgment" or "display[s] a deep-seated favoritism or antagonism that would make fair judgment impossible." 510 U.S. at 551, 555. "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases" do not establish bias unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* at 555. The Court elaborated:

> *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* at 555–56; *see Larson*, 515 F.3d at 1067 ("In the absence of any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity.").

The Ninth Circuit has "repeatedly concluded that a 'state court's finding that the trial judge was impartial . . . is a finding of historical fact that is entitled to a presumption of correctness' under 28 U.S.C. § 2254(d)." *Sivak v. Hardison*, 658 F.3d 898, 924 (9th Cir. 2011) (quoting *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997)); *see also Ortiz v. Stewart*, 149 F.3d 923, 938 (9th Cir. 1998).

This Court, applying the "twin presumptions," *Sivak*, 658 F.3d at 924, of deference to the state courts' determination that Judge Howe was not biased and the presumption of judicial integrity, concludes that Petitioner's judicial bias claim is meritless.

Petitioner's claim of bias is based on what he characterizes as a hostile

relationship between himself and Judge Howe. As evidence of bias, Petitioner cites a handful of testy comments by Judge Howe in courtroom proceedings outside the presence of the jury. (*See, e.g.*, RT 8/6/90 at 5; RT 4/18/91 at 21–22; RT 5/25/91 at 7–9.) However, the record as a whole discloses nothing more than the "rare flareup" and "show of evanescent irritation—a modicum of quick temper that must be allowed even judges." *Offutt v. United States,* 348 U.S. 11, 17 (1954); *see Larson*, 515 F.3d at 1067 ("Because Larson has provided no evidence of the trial court's alleged bias outside of these rulings and remarks—which themselves revealed little more than the occasional mild frustration with Larson's pro se lawyering skills—his claim that he was denied a fair trial also fails."); *Jones v. Luebbers*, 359 F.3d 1005, 1014–15 (8th Cir. 2004) (finding that trial judge's expressions of anger and annoyance towards defense counsel did not rise to the level of judicial bias where there was no showing that the judge was biased against defendant or the merits of the case, or that judge's demonstration of anger or annoyance infected jurors).

While Petitioner was by his own admission a "difficult litigant" (Doc. 220 at 17), on a number of occasions Judge Howe showed patience and forbearance. For example, when Petitioner represented himself during a hearing on his motion for a new trial, Judge Howe offered guidance on how to proceed (RT 12/16/91 at 75–76, 140), interacted with Petitioner in a collegial manner (*id.* at 163), and even complimented Petitioner on his performance (RT 12/17/91 at 128). Judge Howe's occasional flareups when dealing with Petitioner did not "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 at 555; *cf. Crater*, 491 F.3d at 1132 (finding recusal

not required where judge's comments advising defendant to accept plea deal were "founded upon his legitimate knowledge of the proceedings and outcome in [the] case" and offer[ed] no evidence to overcome the 'presumption of honesty and integrity' that we accord to the determinations of a judge") (quoting *Withrow*, 421 U.S. at 47).

Finally, Petitioner asserts that "Judge Howe's partiality was apparent" in his legal rulings, most of which were adverse to Petitioner. (Doc. 214 at 69.) In *Liteky*, however, the Court emphasized that "judicial rulings alone almost never constitute [a] valid basis for a bias or partiality recusal motion." 510 U.S. at 555. Moreover, Judge Howe also made key rulings that favored Petitioner, including his decision to suppress Petitioner's confession and the recording of Ms. Wagner's 911 call.

In sum, Petitioners allegations of judicial bias, based solely on Judge Howe's legal rulings and in-court comments, are insufficient to overcome the presumption of judicial integrity and support a due process violation. The Arizona Supreme Court's denial of this claim was not contrary to or based on an unreasonable application of clearly established federal law or an unreasonable determination of the facts. Claim 9 is denied.

**Claim 13**

Petitioner alleges that his rights under the Sixth and Fourteenth Amendments were violated when the trial court permitted Deborah Wagner to remain in the courtroom during jury selection and after her testimony. (Doc. 214 at 71.)

At Petitioner's second trial, Ms. Wagner was present for *voir dire*, seated in the back of the courtroom. (*See* RT 5/28/91 at 8.) Subsequently, after the jury had been selected, defense counsel asked the court to ask the jurors if they had been tainted by

their exposure to Ms. Wagner's presence. (*Id.*) The court declined, explaining that asking

such questions would "do more damage" than good and finding that there was no

evidence of misconduct and that Ms. Wagner had a right to be present under the Arizona

Constitution. (*Id.* at 8, 11.) The prosecutor indicated that, with respect to the remainder of

the proceedings, Ms. Wagner, who would be the State's first witness, intended to be

present only for the opening statements and her own testimony. (*Id.* at 10.) Over the

prosecutor's objection, the court barred Ms. Wagner from the courtroom during opening

statements but ruled that she could be present after her testimony. (*Id.* at 13.)

Petitioner raised this claim on direct appeal. (Opening Br. at 54.) The claim was

based upon the assumption that Ms. Wagner was present in the courtroom after her

testimony—an assumption that, Petitioner conceded, was supported by nothing in the

record. (*Id.* at n.19.) The Arizona Supreme Court rejected the claim, finding that Ms.

Wagner had a right to be present as a crime victim under the Arizona Constitution.

*Gonzales*, 181 Ariz. at 512, 892 P.2d at 848. The court then stated:

> Deborah, on her own initiative, attended jury selection. She sat in the back
> row of the courtroom, and neither the court nor counsel knew she was there
> until several days later. Nor is there any evidence that prospective jurors
> noticed Deborah or knew who she was during jury selection. Gonzales has
> not shown that Deborah's presence during jury selection was prejudicial.
> There is no evidence that Deborah intended to or did remain in the
> courtroom after she testified, and therefore we consider the matter no
> further.

*Id.*

Petitioner is not entitled to relief on Claim 13 because the Arizona Supreme

Court's rejection of the claim was not contrary to or based on an unreasonable application

of clearly established federal law. As the Sixth Circuit has noted, citing *Carey v.*

*Musladin*, 549 U.S. 70, 77 (2006), there is no clearly established federal law holding "the mere presence of a murder victim's family members in the courtroom can result in inherent prejudice to the defendant's right to a fair trial." *United States v. Lawrence*, 735 F.3d 385, 441 (6th Cir. 2013).

In *Carey*, the Supreme Court observed that some "government-sponsored practices" have been held inherently prejudicial, but noted that it has never held that "private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." 549 U.S. at 76. The Court therefore vacated the Ninth Circuit's grant of habeas relief where the trial court had allowed a murder victim's family members to wear buttons displaying the victim's photograph during trial. *Id.* at 77.

Petitioner also contends that the Arizona Supreme Court's denial of this claim was based on an unreasonable determination of the facts. The Arizona Supreme Court stated that counsel did not know Ms. Wagner was present during jury selection "until several days later," but both defense counsel and the prosecutor told the judge they had been aware of Ms. Wagner's presence during *voir dire*. (RT 5/29/91 at 8, 11.) *Gonzales*, 181 Ariz. at 512, 892 P.2d at 848. The Court finds that this erroneous observation is insufficient to satisfy § 2254(d)(2) because it was not relevant to the supreme court's analysis and was not the basis of the court's conclusion that "Gonzales has not shown that Deborah's presence during jury selection was prejudicial." *Id.*

Claim 13 is denied.

1

2

**Claims 14/15**[12]

3       Petitioner alleges that his rights under the Sixth and Fourteenth Amendments were

4   violated when the trial court determined that witness Martha Trinidad was unavailable

5   and allowed her previous testimony to be read into the record at his retrial. (Doc. 214 at

6   76.) He contends that the State failed to show that it had made a good faith effort to

7   secure Martha's presence and that the Arizona Supreme Court's denial of the claim on

8   appeal was contrary to and an unreasonable application of clearly established federal law

9

10  and based on an unreasonable determination of the facts. (*Id.* at 78–82.)

11      Facts

12

13      Martha Trinidad, the 14-year-old daughter of Petitioner's girlfriend Gloria

14  Alvarez, testified and was cross-examined at Petitioner's first trial. (RT 6/28/91 at 39–

15

16  78.) Before the second trial, the prosecutor personally served subpoenas on both Martha

17  and Ms. Alvarez on Martha's behalf. During Petitioner's second trial, Ms. Alvarez

18  testified that Martha was supposed to be living with her but had run away from home.

19

20  (RT 5/30/91 at 151.) Ms. Alvarez did not know where Martha could be found. (*Id.*) She

21  had run away twice before. (*Id.* at 152.) On one occasion, Ms. Alvarez's brother was able

22  to locate Martha, but after being returned home, she ran away again. (*Id.*)

23      Four days after Ms. Alvarez's testimony, the parties met with the trial court. The

24  prosecutor informed the court that he had spoken with Ms. Alvarez during a break and

25

26  she informed him that Martha had not returned home. (RT 3/3/91 at 100.) He also told the

27  court that the previous week he had requested Detective Butler to drive by the areas

28

---

[12] Petitioner merged Claims 14 and 15 into a single claim. (Doc. 215 at 76 n.41.)

Martha was known to frequent, but the detective was unable to locate her.[13] (RT 6/3/91 at 100, 104.) Petitioner's counsel, while acknowledging that the prosecutor had been "real up front" about Martha's runaway episodes, questioned whether she was "unavailable" under the rules and objected to the admission of her previous testimony. (*Id.* at 101.) The court found Martha was "unavailable" and ruled her prior testimony admissible. (*Id.* at 102.) It was read into the record the next day. (RT 6/4/91 at 25–64.)

On appeal, Petitioner alleged that the State failed to make a good-faith effort to secure Martha's presence at retrial. *Gonzales*, 181 Ariz. at 508, 892 P.2d at 844. The Arizona Supreme Court denied the claim:

> Gonzales first argues that the state failed to make a good-faith effort to secure Martha Trinidad's presence at trial, and thus Martha was not "unavailable" under Rule 804(a)(5), Ariz.R.Evid. Gonzales claims that the state knew that Martha had a history of running away and should have tried to hold her in some manner. He argues that, at the very least, the state should have done more than simply drive by places where Martha "hung out."
>
> Most "good-faith efforts" challenges involve unserved witnesses who cannot be located. But here, Martha and her mother were personally served. While nothing in Rule 804 suggests that service of a subpoena is a *per se* showing of good-faith efforts, we have said that "the true issue is whether the state made a good-faith effort to *locate* the witness so that he or she could be put under subpoena." *State v. Edwards,* 136 Ariz. 177, 182, 665 P.2d 59, 64 (1983) (citing *State v. Pereda,* 111 Ariz. 344, 345, 529 P.2d 695, 696 (1974) ("If a witness cannot be served by subpoena, it then becomes a matter within the sound discretion of the trial court to determine whether a sufficient effort has been made to place the witness under subpoena.")). Service of process and the efforts made to locate Martha upon learning that she was missing satisfy the unavailability requirement of the rule.

---

[13] At the hearing on Petitioner's motion for a new trial, defense counsel testified that he had also unsuccessfully searched for Martha at one of the locations provided by her mother. (RT 12/16/91 at 46.)

*Id.* at 508–09, 892 P.2d at 844–45.

Analysis

The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had . . . a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). The unavailability requirement is not met unless the government made a good-faith effort to obtain the witness's presence at trial. *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *abrogated on other grounds by Crawford*, 541 U.S. 36; *see Barber v. Page*, 390 U.S. 719, 725 (1968). While the prosecution need not take every conceivable measure to secure a witness, it must demonstrate that it took reasonable steps to do so. *See Roberts*, 448 U.S. at 74–77.

In *Hardy v. Cross*, 132 S. Ct. 490, 495 (2011) (per curiam), the Supreme Court, citing *Roberts*, reiterated that "when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." The Court further noted that on habeas review:

> the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken. Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed.

*Id.*

1   The Arizona Supreme Court's decision was reasonable. In *Roberts*, the

2   prosecution attempted to locate the witness by contacting her mother and family, who

3   reported that they did not know of her whereabouts, and by issuing a subpoena at her

4   parents' home on five separate occasions over the course of four months. 448 U.S. at 74–

5   77. The Supreme Court, on direct review, found these good faith efforts sufficient to

6   show that the witness was unavailable. *Id.*; *see Jackson v. Brown*, 513 F.3d 1057, 1083

7   (9th Cir. 2008) (finding that the state made reasonable efforts where it served the witness

8   while she was in custody, checked a database of aliases, and visited the street corner

9   where she worked as a prostitute).

10   In this case, the prosecution actually served Martha with a subpoena, and served

11   Mrs. Alvarez on behalf of Martha. When Martha ran away from home again and her

12   mother testified that she did not know where Martha was, the prosecutor directed a

13   detective to search the areas she was known to frequent. Under these circumstances, the

14   Arizona Supreme Court's decision upholding the trial court's unavailability

15   determination was not "so lacking in justification that there was an error well understood

16   and comprehended in existing law beyond any possibility for fairminded disagreement."

17   *Richter*, 562 U.S. at 103.  This claim is denied.

**Claim 17**

Petitioner alleges that his rights were violated when the trial court improperly

admitted Ms. Wagner's in-court identification, which was unreliable and tainted by her

exposure to Petitioner during the first trial. (Doc. 214 at 83.)

Prior to trial, following the *Dessureault* hearing, the court determined that Ms.

Wagner's in-court identification of Petitioner would be admissible. The court found that exposure to a newspaper photograph of Petitioner was insufficient to taint her in-court identification of Petitioner. (RT 1/15/91 at 22–27.) The court explained that Ms. Wagner "was present at the assault upon herself and had a considerable amount of time in which to observe firsthand the assailant. There was absolutely nothing in police conduct and nothing in the newspaper that would in any way taint her testimony." (*Id.* at 27.)

At Petitioner's first trial, Ms. Wagner, when asked on direct examination whether the person who attacked her was in the courtroom, replied "Yes, I think he is" and pointed to Petitioner. (RT 1/21/91 at 61.) On cross-examination, however, she suggested that her identification of Petitioner had become more certain, explaining, "I didn't get any kind of feelings until I come into this courtroom yesterday and looked at the man you're trying to defend." (RT 1/22/91 at 23.) On redirect examination, Ms. Wagner did not hesitate when asked how certain she was that Petitioner was the attacker: "That man is the man that was in our house and killed us [sic]." (*Id.* at 28.) The first trial ended in a hung jury. Prior to the second trial, defense counsel moved to dismiss the charges, citing the change in the strength of Ms. Wagner's identification of Petitioner during the first trial and his concern that she was "obviously going to identify [Petitioner] as the perpetrator" at the next trial. (RT 3/25/91 at 3–4.) The court denied the motion. (*Id.* at 8.) During her testimony at Petitioner's retrial, Ms. Wagner identified Petitioner without hesitation. (RT 5/28/91 at 59.)

On direct appeal, Petitioner claimed that the trial court erred by admitting Ms. Wagner's identification testimony because it "was tainted by her inability to identify him

at the first trial and her identification did not have sufficient indications of reliability." (Opening Br. at 25.) He argued that the "suggestive position of Mr. Gonzales during the first trial, seated next to defense counsel," allowed her to make a positive in-court identification during the second trial. (*Id.*) Petitioner also contended that the identification was unreliable under the *Biggers* factors. (*Id.* at 26–28.) The Arizona Supreme Court held that the claim was waived because Petitioner did not object prior to trial. *Gonzales*, 181 Ariz. at 510, 892 P.2d at 846. The court also found, in the alternative, that "merely sitting at the defense table during trial where the defendant is neither shackled nor dressed in prison garb is not unduly suggestive." *Id.* Petitioner alleges that this decision was contrary to and an unreasonable application of clearly established federal law, and based on an unreasonable determination of the facts. (Doc. 214 at 84.)

The Court disagrees. Petitioner does not cite, and this court has not found, a Supreme Court case that extends the protections of *Biggers* and its progeny to cases where the eyewitness first identifies a defendant at trial. *See United States v. Domina*, 784 F.2d 1361, 1368 (9th Cir. 1986) ("None of these cases has set any guidelines for in-court identification procedures nor indicated that in-court identification must be made in a way that is not suggestive."); *see also Perry*, 132 S. Ct. at 720–21 ("We have not extended pretrial screening for reliability to cases in which the suggestive circumstances were not arranged by law enforcement officers."). As a result, the Court cannot conclude that the state courts' resolution of Petitioner's claim was contrary to, or an unreasonable application of, Supreme Court precedent. *See Carey*, 549 U.S. at 74, 77.

In addition, the mere fact that Ms. Wagner definitively identified Petitioner for the

first time at trial does not establish a constitutional violation. In *Johnson v. Sublett*, 63 F.3d 926, 928 (9th Cir. 1995), the victim-witness, Jones, identified the defendant, Johnson, at trial. Johnson challenged the in-court identification. *Id.* He noted that Jones had been unable to pick Johnson's photo from a photographic lineup. *Id.* He also argued that his presence at a suppression hearing, where he was identified by Jones, was unduly suggestive and "this pretrial exposure to the victim rendered inadmissible the victim's in-court identification of Johnson before the jury." *Id.*

On habeas review, the Ninth Circuit rejected these arguments. The court explained that "the photo spread had no significance. If anything, Jones' failure to pick Johnson out of the photo spread was a benefit to the defense." *Id.* at 929. Likewise, Ms. Wagner's inability to identify Petitioner in a photo lineup benefited the defense when she was cross-examined at Petitioner's second trial. (*See* RT 5/28/91 at 108–111.)

With respect to Jones's exposure to Johnson at the suppression hearing, the Ninth Circuit explained that "[t]he bare fact that a confrontation was suggestive does not alone establish constitutional error. The confrontation must be impermissibly or unduly suggestive under the totality of the circumstances." *Johnson*, 63 F.3d at 929 (citing *Biggers*, 409 U.S. at 196). While in-court identifications may be subject to some suggestion, "the suggestive character of courtroom logistics [is] not *unnecessarily* suggestive." *Id.* (citing *Baker v. Hocker*, 496 F.2d 615, 617 (9th Cir. 1974)). Petitioner does not suggest how his presence at the first trial was impermissibly or unduly suggestive.

Moreover, any possible prejudice from Ms. Wagner's in-court identification of

Petitioner during his retrial was mitigated by counsel's cross-examination. *See id*. Ms. Wagner conceded that she had "been in court several times and [had] looked at this person sitting next to [defense counsel]." (RT 5/28/91 at 97.) Counsel also questioned Ms. Wagner about her tentative identification of Petitioner during the first trial and her inability to identify him from the photo lineup. (*Id*. at 97–99, 108–11.) This was sufficient to test the reliability of the in-court identification. *See Perry*, 132 S. Ct. at 721.

Petitioner is not entitled to relief on Claim 17.

**Claim 19**

Petitioner alleges that the trial court violated his Fourteenth Amendment rights when it failed to call a mistrial or strike the testimony of two prosecution witnesses after they failed to obey an order of exclusion. (Doc. 214 at 87.)

At the start of Petitioner's second trial, the court granted defense counsel's request under Rule 9.3 of the Arizona Rules of Criminal of Procedure to exclude Ms. Wagner from the courtroom until after her testimony. (RT 5/28/91 at 12.) The court also stated that its ruling on the sequestration of witnesses remained in place from the first trial. (*Id*. at 12–13.)

Ms. Wagner was the prosecution's first witness. Roger Daughtry testified directly after her. At the end of his cross examination, he admitted that he had spoken with Ms. Wagner outside the courtroom the day before. (RT 5/29/91 at 43.) On redirect examination, Daughtry testified that the "general subject matter" of their conversation was that "basically we were positive in our minds it's the right man and we have no doubt about it." (*Id*. at 44.) Petitioner raised this claim on direct appeal, arguing that the

witnesses violated the court's order and their encounter bolstered Ms. Wagner's confidence in her identification of Petitioner. (Opening Brief at 37–38.)

The Arizona Supreme Court found the issue waived and held there was no fundamental error:

> Gonzales was notified well in advance of the second trial and [sic] this conversation that Deborah would identify Gonzales without hesitation. Gonzales made no objection at trial. The court did not commit fundamental error by failing to declare a mistrial *sua sponte*.

*Gonzales*, 181 Ariz. at 508, 892 P.2d at 844.

Petitioner contends that the court's ruling was an unreasonable application of clearly established federal law because the court "failed to identify the controlling constitutional authority" and "fundamentally failed to recognize the impact of the legal principles made relevant by the facts of this case." (Doc. 214 at 91.) The Court disagrees.

First, the United States Supreme Court has explained that to withstand analysis under 2254(d)(1), a state court decision "does not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

More significantly, there is no clearly established law holding that the failure to exclude or sequester witnesses violates due process.[14] In *Larson v. Palmateer*, 515 F.3d

---

[14] As clearly established federal law governing this claim, Petitioner cites *Geders v. United States*, 425 U.S. 80 (1976), and *Perry v. Leeke*, 488 U.S. 272 (1989). *Geders* and *Perry* address the Sixth Amendment right to counsel in the specific context of defendants who were prohibited by a judge from conferring with their attorney during a recess from their testimony. The cases discuss the general principle that judges have the authority to sequester witnesses and order them not to discuss their testimony in order to

at 1065, the Ninth Circuit observed that "[n]either this court nor the Supreme Court has ever held that the failure to exclude witnesses can violate due process." *Id.* at 1065. The trial court has the *discretion* to exclude the testimony of a witness who disobeyed an exclusion order. *See Holder v. United States*, 150 U.S. 91, 92 (1893). However, "[s]ince the purpose of the order is to gain assurance of credibility and its violation is a legitimate subject of comment in this respect, it seems proper that unless the violation has somehow so discredited the witness as to render his testimony incredible as a matter of law he should not be disqualified from testifying." *Taylor v. United States*, 388 F.2d 786, 788 (9th Cir. 1967).

For purposes of habeas review, the question is whether the contact between Daughtry and Ms. Wagner "rendered the trial so fundamentally unfair as to violate due process." *Larson*, 515 F.3d at 1064 (citing *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998)). It did not. Ms. Wagner did not "tailor" her testimony to fit Daughtry's. Her testimony preceded his. They each repeated their description of Petitioner's appearance, including his clothing, from the first trial. Daughtry again testified that the man burglarizing his home wore a plaid shirt or jacket, beige with big red squares, with some gray or green mixed in, jeans, white tennis shoes, and a baseball cap. (RT 5/59/91 at 16; *see* RT 1/17/91 at 45, 55, 73.) Ms. Wagner again testified that her assailant wore "all dark clothing" with light colored tennis shoes and a hat without a brim, like a "stocking cap." (RT 5/28/91 at 69–70; *see* RT 1/21/91 at 60, RT 1/22/91 at 4, 11–13.)

---

"to lessen the danger that their testimony will be influenced by hearing what other witnesses have to say, and to increase the likelihood that they will confine themselves to truthful statements based on their own recollections." *Perry*, 488 U.S. at 281–82.

While Petitioner asserts that the conversation between Daughtry and Ms. Wagner bolstered the confidence with which Ms. Wagner identified Petitioner during the second trial, the record shows that she had become positive in her identification of Petitioner by the time she was cross-examined in the first trial. When defense counsel asked about her failure to pick Petitioner from the photographic lineup, Ms. Wagner stated "I didn't get any kind of feeling until I came into this courtroom yesterday and looked at the man you're trying to defend." (RT 1/22/91 at 23.)

In *U. S. ex rel. Clark v. Fike*, 538 F.2d 750 (7th Cir. 1976), the Seventh Circuit on habeas review considered the petitioner's claim that he was deprived of a fair trial when prosecutors held a pretrial meeting with their major witnesses in violation of the trial court's sequestration order. At the meeting, the witnesses "discussed their general impressions of the petitioner," including the fact that he was younger than the age reported by one of the witnesses. *Id.* at 757. "However, discrepancies were not ironed out, nor did the witnesses have a general discussion of their prospective testimony among themselves." *Id.* at 757. The petitioner's trial counsel used the meeting to impeach the witnesses, but made no objection to the meeting during trial and did not raise the issue on appeal. *Id.* The Seventh Circuit held that the petitioner was not entitled to habeas relief, explaining:

> That the witnesses in this case did meet together, and did discuss some aspects of their testimony was a proper subject for impeachment on cross-examination and for comment during closing argument. However, the violation here is not so extreme as to render the witnesses' testimony incredible as a matter of law, nor is it so extreme as to deny the petitioner fundamental fairness in his trial.

- 40 -

*Id.* at 758.

Here, the meeting between Daughtry and Ms. Wagner did not render Petitioner's trial fundamentally unfair. The discrepancies in their testimony concerning Petitioner's appearance remained, and any increase in the certainty with which Ms. Wagner identified Petitioner at the second trial was not attributable to her discussion with Daughtry.

The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of Supreme Court law. Accordingly, Claim 19 is denied.

**Claim 20**

Petitioner alleges the trial court denied his right to counsel by discussing a jury note without summoning counsel. (Doc. 214 at 92.)

During an afternoon break on the second day of Petitioner's retrial, one of the jurors submitted a note to the bailiff. (ME 5/29/91.) The note, which was unsigned and marked 3:06 p.m., asked if any hair samples were found in the cap in the Wagners' courtyard and whether any fingerprints were found on the lighter at Daughtry's home. (ROA 110.) The judge showed the note to counsel. (RT 5/29/91 at 119.) At 3:28 p.m., the court went back on the record to discuss the note with counsel and Petitioner, outside the presence of the jury. (RT 5/29/91 at 118; ME 5/29/91.) Defense counsel expressed concern that the letter indicated the jurors were already discussing the case. (*Id.* at 118–19.) The judge told the parties that the note "came from one juror. I talked to them about it." (*Id.* at 119.) Counsel again expressed concern that the jurors were disobeying the court's admonition. (*Id.*) The judge responded, "I'll find out." (*Id.*)

After the jurors returned to the courtroom, the judge addressed them as follows:

Welcome back, jurors. One of you handed me a written question. May I inquire whether that was just from one juror [sic] talked to each other before I got a no [sic] from question writer. It's okay if you write down a question and give it to me. What I did in this case was show it to counsel. Remember, you haven't heard the whole case.

(*Id.* at 119–20.) The judge then cautioned the jurors to be patient and to keep an open mind while the evidence came in. (*Id.* at 120.)

On direct appeal, the Arizona Supreme Court found the issue waived and held there was no fundamental error:

Gonzales argues that he was denied his right to counsel when the court discussed a juror note with the jury outside the presence of counsel. It appears from the record that the judge simply inquired about the source of the note and did not discuss its contents. Thereafter, he discussed the note with the lawyers, and all agreed that the judge should simply admonish the jury not to form any opinions until all the evidence was in and instruct them on the proper procedure for juror notes. Gonzales made no objection at trial. There was no error, let alone fundamental error.

*Gonzales*, 181 Ariz. at 508, 892 P.2d at 844.

Petitioner contends that the court's statement that the trial judge "simply inquired about the source of the note and did not discuss its contents" is an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). (Doc. 214 at 94.) He also asserts that the court's conclusion that there was no error was contrary to and an unreasonable application of clearly-established federal law "regarding the right to have counsel present at all critical stages of the proceedings." (*Id.*)

Neither of these arguments is convincing. First, the record is ambiguous with respect to the substance of the judge's discussion with the jurors. Textual ambiguity does not render the Arizona Supreme Court's factual determination objectively unreasonable.

- 42 -

1
2
3
4
5
6
7
8

*See Rice v. Collins*, 546 U.S. at 341–42 (explaining that the fact that "[r]easonable minds reviewing the record might disagree" about the finding in question is not sufficient on habeas review to supersede the state court's determination). Contrary to Petitioner's argument, it is not implausible that the judge spoke with the jurors to determine who wrote the unsigned note without discussing its contents and subsequently addressed the jurors to "find out" if they had discussed the note among themselves.

9
10
11
12
13
14
15
16
17
18
19
20

The Arizona Supreme Court's finding of "no error" was not contrary to or an unreasonable application of clearly established federal law. Petitioner's reliance on *Rushen v. Spain*, 464 U.S. 114 (1983) is misplaced. In *Rushen*, the Supreme Court vacated the granting of a writ of habeas corpus by lower federal courts, and "emphatically disagree[ed]" with the lower courts' view that unrecorded *ex parte* communications between a trial judge and juror can never be harmless error. *Id.* at 117. The Court noted that few trials occur "in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." *Id.* at 118.

21
22
23
24
25

Accordingly, *ex parte* contacts are subject to the rule of harmless error. *Id.* at 120. In order to grant relief, the error must have "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see Smith v. Curry*, 580 F.3d 1071, 1085 (9th Cir. 2009).

26
27
28

In *Rushen*, the Court instructed that "[w]hen an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." *Id.* at 119. That is what happened here. The judge disclosed the

communication immediately after it occurred. Defense counsel did not object to the *ex parte* communication. He was concerned not with the subject matter of the communication but with the possibility that the jurors had improperly begun discussing the case. The court questioned the jurors and determined that they had not done so.

On this record, even assuming the trial court erred in having the *ex parte* communication, such error was harmless given the absence of any evidence that the substance of the communication had an effect on the jury's impartiality. *Rushen*, 464 U.S. at 120. Claim 20 is denied.

**Claim 26**

Petitioner alleges that the trial court committed fundamental error by not properly defining reasonable doubt in the jury instructions. (Doc. 214 at 95.)

At the conclusion of the trial, the court provided the following instructions:

> The defendant has pled not guilty. The defendant's plea of not guilty means that the State must prove every part of the charge beyond a reasonable doubt.

> The law does not require a defendant to prove his innocence. He is presumed by law to be innocent. This means the State must prove all of its case against the defendant.

> The State must prove the defendant guilty beyond a reasonable doubt.

> The State must prove all of its case against the defendant with its own evidence.

(RT 6/6/91 at 44.)

According to Petitioner, because the court failed to define the phrase "reasonable doubt," "the jury was unable to accurately apply the state's burden to the facts presented

in this case." (Doc. 214 at 96.) Petitioner raised the claim on direct appeal. The Arizona Supreme Court's rejection of the claim, *Gonzales*, 181 Ariz. at 508, 892 P.2d at 844, was neither contrary to nor an unreasonable application of clearly established federal law. "The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). Claim 26 is denied.

**Claim 27**

Petitioner alleges that he was denied his right to counsel during the proceedings on his motion for a new trial. (Doc. 214 at 98.)

On direct appeal, Petitioner argued that he did not knowingly and intelligently waive his right to counsel, and, even if he did, he withdrew the waiver and was thereafter denied appointed counsel at the start of the hearing on his motion. The Arizona Supreme Court denied the claim. *Gonzales*, 181 Ariz. at 510, 892 P.2d at 846. Petitioner contends that the decision was based on an unreasonable determination of the facts and was contrary to and an unreasonable application of clearly established federal law. The Court disagrees.

Background

Petitioner was represented at trial by Morton Rivkind. Following the first trial, Petitioner waived counsel and Rivkind moved to withdraw. (ROA 94, 96; RT 4/18/91.) The court found Petitioner competent to represent himself, granted the motion to withdraw, and appointed Rivkind as advisory counsel. (RT 4/18/91 at 8; ME 4/18/91.)

Petitioner subsequently withdrew his request to proceed *pro per*, and Rivkind was reappointed prior to the second trial. (*See* ROA 106.)

Following Petitioner's conviction, Rivkind filed a motion for new trial. (ROA 131.) Petitioner then filed a motion to proceed *pro per*, a motion for a new trial, and a motion alleging ineffective assistance of counsel. (ROA 134, 135, 138.) Rivkind filed a motion to withdraw as counsel. (ROA 139.) At a status conference on August 6, 1991, the court addressed Petitioner to be sure he understood the proceedings and to determine if he was competent to represent himself. (RT 8/6/91 at 3–11.) The court found that Petitioner understood the risks and difficulties of proceeding *pro per* and again determined that he was competent to represent himself. (*Id*. at 11–13.) The court appointed Gene Stratford as advisory counsel. (ME 8/6/91.) Stratford was subsequently replaced by Jeffrey Ross.

The hearing on Petitioner's motion for a new trial was held on December 9, 1991. At the outset of the hearing the court considered Ross's motion to withdraw. (ME 12/9/91.) Citing attorney-client privilege, Ross indicated that he was unable to disclose the basis of his need to withdraw. (RT 12/9/91 at 3–4.) Petitioner stated that Ross had told him he was too busy with other cases to competently assist Petitioner. (*Id*. at 4–5.) To support this contention, Petitioner explained that he had secretly recorded his conversation with Ross. (*Id*. at 6.) After the trial court listened to the tape, Ross indicated that his motion to withdraw was unrelated to his time commitments. (*Id*. at 10.) The court again explained the difference to Petitioner between an advisory attorney and one that represented the defendant. (*Id*. at 11–12.) The court then admonished Petitioner, noting

- 46 -

that Ross was "just trying to give you honest advice, and here you are secretly recording him, which is a way to destroy relationship between you and a lawyer." (*Id*. at 15.) The court continued:

> You had the public defender, and for reasons they didn't express, they moved to withdraw.
>
> You had Mr. Rivkind, you fired him twice.
>
> Mr. Stratford was on the case for a while, and then he withdrew.
>
> Now Mr. Ross moves to withdraw.
>
> The common element is you don't get along with any lawyer, it appears, on the record that I have.

(*Id*. at 15.)

The trial court granted Ross's motion to withdraw. (*Id*. at 16.) The court told Petitioner to proceed with his motion for a new trial. (*Id*. at 20.) Petitioner repeated that he needed "counsel." (*Id*. at 20–21.)

The hearing continued a week later. On the third day of the hearing, Petitioner requested "advisory" counsel, which the court again denied. (RT 12/17/91 at 2, 4–5, 6.) Following the hearing, the court denied Petitioner's motion for new trial. (*Id*. at 121.)

<u>Analysis</u>

In denying this claim on direct appeal, the Arizona Supreme Court found that Petitioner did not withdraw his waiver of the right to counsel:

> The record is clear that the judge made the appropriate inquiries and admonitions and properly found Gonzales's waiver to be knowing and intelligent.
>
> Even if his waiver of counsel were knowing and intelligent,

Gonzales claims that he withdrew his waiver. He relies primarily on Rule 6.1(e), Ariz.R.Crim.P., which states that a defendant may withdraw his waiver of the right to counsel at any time. But Gonzales asked for advisory counsel, which is discretionary under Rule 6.1(c), Ariz.R.Crim.P.[FN3] He did not ask to have counsel appointed. He thus did not withdraw his waiver of counsel. The court did not abuse its discretion by failing to continue the hearing and by refusing to appoint new advisory counsel. The right to represent oneself is a constitutional right. *Faretta v. California,* 422 U.S. 806, 819–20, 95 S. Ct. 2525, 2533, 45 L.Ed.2d 562 (1975). A court may not interfere with that choice without an unequivocal revocation of the defendant's waiver of counsel. *State v. Rickman,* 148 Ariz. 499, 503, 715 P.2d 752, 756 (1986). "Once a defendant has waived his right to counsel, that waiver continues until he 'clearly' indicates a change of mind." *Id.* After reviewing the record, we find that Gonzales never withdrew his waiver of counsel.

FN3. The record clearly indicates that Gonzales was seeking *advisory* counsel only. (R.T. of Dec. 9, 1991, at 17–22; R.T. of Dec. 17, 1991, at 2, 4).

*Gonzales*, 181 Ariz. at 510, 892 P.2d at 846.

Petitioner contends that the Arizona Supreme Court's denial of the claim was based on its unreasonable determination that Petitioner did not withdraw his waiver but only requested advisory counsel.

At the December 9 hearing, after Ross had withdrawn as advisory counsel, Petitioner insisted that he needed counsel in order to proceed with the hearing on his motion for a new trial. In context, it is clear that Petitioner was referring to advisory counsel. As Respondents note, he never stated that he wished to give up his *pro per* status, as evidenced in his statements to the court that "I need counsel to advise me" and "that's why I need advisory counsel." (RT 12/9/91 at 18, 21.) Later, on the third day of the hearing, the court addressed a motion for reconsideration filed by Petitioner. When asked, "What is your motion?" Petitioner replied, "For counsel just to like advise me,

because I'm not understanding all these statutes that they're talking about . . ." (RT 12/17/91 at 2; *see id.* at 5.) The court explained that it had twice granted Petitioner's motion to proceed *pro per*, each time appointing advisory counsel to assist Petitioner. (*Id.* at 5–6.) Petitioner asked, "So that was your own doing, putting in advisory counsel?" The court responded, "It sure was. You didn't ask for it," to which Petitioner replied, "That's what I'm asking for." (*Id.* at 6.)

Based on this record, the Arizona Supreme Court's factual determination that Petitioner did not withdraw his waiver is not objectively unreasonable. *See Rice v. Collins*, 546 U.S. at 341–42. Relief is precluded under § 2254(d)(2).

Petitioner also contends that the Arizona Supreme Court's denial of the claim was contrary to and an unreasonable application of clearly established federal law. Because Petitioner did not withdraw his waiver of counsel, and instead only requested the appointment of advisory counsel, the Arizona Supreme Court's ruling was not contrary to or an unreasonable application of clearly established federal law. The trial court's refusal to appoint new advisory counsel did not violate Petitioner's constitutional rights, because "a defendant who waives his right to counsel does not have a right to advisory counsel." *United States v. Moreland*, 622 F.3d 1147, 1155 (9th Cir. 2010); *see United States v. Mendez-Sanchez*, 563 F.3d 935, 947 (9th Cir. 2009) (noting that "under our established precedent there is no right to the assistance of standby counsel"); *see also McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) ("*Faretta* does not require a trial judge to permit 'hybrid' representation.").

Even if Petitioner had withdrawn his waiver of counsel, § 2254(d)(1) would

preclude relief. There is no clearly established federal law requiring the appointment of counsel after a defendant has validly waived counsel.

In *Marshall v. Rodgers*, 133 S. Ct. 1446 (2013) (per curiam), the defendant waived his right to counsel on three occasions. After he was convicted, he requested the appointment of counsel to file a motion for a new trial. *Id.* at 1448. The trial court, exercising its discretion under California law, denied the motion. *Id.* The state appellate court affirmed. *Id.* On habeas review the Ninth Circuit Court of Appeals reversed the district court's denial of habeas relief, holding that the "Sixth Amendment right to counsel was violated when the trial court denied his timely request for representation for a new trial motion." *Rodgers v. Marshall*, 678 F.3d 1149, 1163 (9th Cir. 2012). In reversing the Ninth Circuit, the Court "assumed, without so holding," that "after a defendant's valid waiver of his right to trial counsel under *Faretta*, a post-trial, preappeal motion for a new trial is a critical stage of the prosecution." *Marshall*, 133 S. Ct. at 1449. The Court noted, however, that it has not announced a "specific legal rule" regarding "postwaiver requests of appointment of counsel." *Id.* at 1450. Therefore, the conclusion of the California state courts that there was no Sixth Amendment violation was neither contrary to nor an unreasonable application of clearly established federal law. *Id.* at 1451.

The Arizona Supreme Court's denial of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Accordingly, Petitioner is not entitled to relief on Claim 27.

**Claims 29 and 30**

- 50 -

1

2       The trial court sentenced Petitioner to death based on two aggravating factors: that

3   Petitioner knowingly created a grave risk of death to another person in addition to the

4   victim of the offense, under A.R.S. § 13–703(F)(3), and that the murder was committed

5   for pecuniary gain, under § 13–703(F)(5).[15] The Arizona Supreme Court affirmed.

6

7   *Gonzales*, 181 Ariz. at 513–14, 892 P.2d at 849–50. Petitioner challenges the state courts'

8   application of these factors. (Doc. 214 at 106–15.)

9       Whether a state court correctly applied an aggravating factor is a question of state

10  law, and federal habeas review is limited to determining whether the state court's finding

11  was so arbitrary or capricious as to constitute an independent due process or Eighth

12  Amendment violation. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). A state court's finding

13  of an aggravating factor is arbitrary or capricious only if it is a finding no reasonable

14

15  sentencer could have made. *Id.* at 783. The question is "whether, after viewing the

16  evidence in the light most favorable to the prosecution, *any* rational trier of fact" could

17  have found the factor beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319

18  (1979). A habeas court faced with a record of historical facts which supports conflicting

19  inferences must presume that the trier of fact resolved any such conflicts in favor of the

20

21  prosecution. *Id.* at 326.

22      Applying these principles, the Court concludes that Petitioner is not entitled to

23  relief on Claims 29 and 30.

24      Claim 29

25

26  _____

27      [15] Arizona has since renumbered this statute. The current corresponding sections
    are 13–751(F)(3) and (5).

28

Petitioner alleges that the state courts applied Arizona law in an arbitrary and capricious way by finding that Petitioner knowingly created a grave risk of harm to Ms. Wagner. (Doc. 214 at 106.) Petitioner also contends that the courts' factual findings were unreasonable and violated the principle that aggravating factors must sufficiently narrow the class of defendants eligible for the death penalty. (*Id.*)

The grave risk of death aggravating factor provides that, in determining whether to impose a death sentence, a trier of fact shall consider whether "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense." A.R.S. § 13-703(F)(3).

The trial court found that the factor had been proved. The court determined that "Deborah Wagner was not an intended victim of the murder of Darrel Wagner, but was, to the Defendant's personal knowledge, within the zone of danger during the time the Defendant was stabbing Darrel Wagner, and quite aside from that time in which Defendant was deliberately and independently stabbing Deborah Wagner." (RT 4/27/92 at 59.)

On direct appeal, the Arizona Supreme agreed that Petitioner "knowingly placed Deborah in grave risk of death even before turning his weapon on her." *Gonzales*, 181 Ariz. at 514, 892 P.2d at 850. The court explained that its "inquiry is whether, during the course of the killing, the defendant knowingly engaged in conduct that created a real and substantial likelihood that a specific third person might suffer fatal injuries." *Id.* (quotation omitted). The court then reasoned:

Deborah was confined in a small (10′ x 10′) courtyard with Gonzales as he repeatedly stabbed her husband. Moreover, Deborah was not just a bystander. She attempted to rescue her husband by jumping on Gonzales's back as he was stabbing Darrel. Whether she could have instead retreated is irrelevant. One who murders knowing others are present can expect that someone may attempt to interfere, particularly when that person is the victim's spouse. Gonzales's actions created a "zone of danger" for Deborah in which there was a realistic possibility that she may have suffered fatal injuries. Indeed, she almost died. This grave risk occurred, as the statute requires, during the commission of the offense against Darrel.

We reject Gonzales's argument that § 13–703(F)(3) does not apply because Deborah was an "intended victim" of the offense. For Deborah to have been an intended victim, as contemplated by our cases, Gonzales must have acted with the intent to kill her. Moreover, the intent to kill must have been formed *before* Deborah was placed in grave risk of death. Gonzales argues that Deborah became an intended victim the moment she jumped on his back. But Deborah was placed in grave risk *before* she jumped on his back. Thus, even if Gonzales stabbed Deborah with the intent to kill her, the "intended victim" argument fails because that intent was not formed before Deborah was placed in grave risk. Additionally, there was no evidence that Gonzales intended to kill Deborah, and the state did not charge him with her attempted murder. Gonzales's only intended murder victim was Darrel. When Deborah jumped on Gonzales's back, his intent was to get her off. He did this by using his body and his weapon, seriously injuring her in the process. Once he threw her off his back, he fled the scene. Gonzales's reliance on the "intended victim" cases is thus misplaced. We find that § 13–703(F)(3) is satisfied.

*Id.* (citations omitted).

Petitioner contends that the Arizona Supreme Court unreasonably found that Ms. Wagner was not an intended victim. According to Petitioner, "it is impossible for a court to find that Gonzales attacked Mr. Wagner with a knife with the intent of killing him while simultaneously finding that Gonzales did not intend to kill Ms. Wagner when he attacked her with the same knife moments later." (Doc. 214 at 109.) The Court disagrees.

In arguing that the Arizona courts "failed to apply a consistent and coherent

definition of intent" (Doc. 217 at 56), Petitioner conflates the legal element of intent required to prove the underlying offense in a felony murder charge with the assessment necessary to determine whether Ms. Wagner, like her husband, was an intended murder victim. There is nothing unreasonable about the Arizona Supreme Court drawing a distinction between Petitioner's intent in attacking Mr. Wagner and his intent in attacking Ms. Wagner. Furthermore, a reasonable sentencer could have found, for the reasons set forth by the Arizona Supreme Court, that Ms. Wagner was in the zone of danger created by Petitioner's attack on Mr. Wagner, and that if Petitioner ever intended to kill her, it was only after she jumped on his back in order to stop the ongoing attack on her husband. Petitioner's intent in attacking Ms. Wagner was to free himself. When he accomplished that by knocking her from his back, he fled the scene.

Petitioner argues that the (F)(3) factor fails to narrow the class of death-eligible defendants. As Petitioner acknowledges, the Arizona Supreme Court has held that the factor is not overbroad or arbitrary. *See, e.g.*, *State v. Roque*, 213 Ariz. 193, 218, 141 P.3d 368, 393 (2006) ("The (F)(3) factor still requires a defendant to have put a third party at grave risk of death in the commission of a murder, and, by distinguishing that act from murders in which no third parties are endangered, the (F)(3) factor adequately narrows the class of defendants eligible for the death penalty."). Petitioner argues, however, that in his case the Arizona Supreme Court construed the factor "in an arbitrary, vague and overbroad way when it concluded that '[o]ne who murders knowing others are present can expect that someone may attempt to interfere, particularly when that person is the victim's spouse.'" (Doc. 214 at 112.)

Again, Petitioner mischaracterizes the court's ruling. The court did not, as Petitioner asserts, find that "committing a murder in front of another person immediately qualifies that person as having placed another in a grave risk of harm." (*Id.*) Instead, in finding that Petitioner created a "zone of danger," the court took into account a variety of factors, including the small space in which the attacks occurred and the fact that Ms. Wagner was not simply a bystander but the victim's wife and therefore especially likely to intervene. *Gonzales*, 181 Ariz. at 514, 892 P.2d at 850. The court's ruling did not impermissibly expand the category of death-eligible defendants.

In sum, a "rational factfinder" could have determined, as the trial court and the Arizona Supreme Court found, that the intended victim of the murder was Mr. Wagner, and that Petitioner, as he attacked Mr. Wagner and stabbed him to death, knowingly placed Ms. Wagner at a grave risk of death. Petitioner is not entitled to habeas relief on Claim 29.

<u>Claim 30</u>

Petitioner alleges that the state courts improperly found that the pecuniary gain aggravating factor had been proven. (Doc. 214 at 113.) The Arizona Supreme Court rejected this claim on direct appeal:

> Gonzales argues that the evidence does not support a finding that he committed the murder in expectation of pecuniary gain. He claims that the robbery ended when he was confronted by Darrel Wagner and that the subsequent murder was "unexpected and accidental." We do not agree.
>
> To prove the A.R.S. § 13–703(F)(5) aggravating factor, the state must show that a motivation for the murder was the expectation of pecuniary gain. We have held that when the defendant kills to facilitate his escape and to permit him to take and keep stolen items, he furthers his

pecuniary gain motive. The Wagners interrupted Gonzales during the burglary of their home. Gonzales was there to steal from them.

The trial court found beyond a reasonable doubt that Gonzales intended to kill Darrel. His murder was not "accidental." This is plainly evident from the number of stab wounds. Gonzales's primary motivation was to steal the Wagner's property. Darrel's murder was directly connected to that goal. We agree with the trial court that the murder of Darrel Wagner was committed for pecuniary gain.

*Gonzales*, 181 Ariz. at 513, 892 P.2d at 849 (citations omitted).

Petitioner argues that there was insufficient evidence to support a finding that the murder was committed in the expectation of pecuniary gain. He also contends that the pecuniary gain aggravating factor is unconstitutionally vague and overbroad. Neither argument is persuasive.

First, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that Petitioner, who was burglarizing the Wagners' home, committed the murder to facilitate his escape and keep the stolen items. *See, e.g., Williams v. Stewart*, 441 F.3d 1030, 1060 (9th Cir. 2006); *Correll v. Stewart*, 137 F.3d 1404, 1420 (9th Cir. 1998); *State v. Runningeagle*, 176 Ariz. 59, 65, 859 P.2d 169, 175 (1993).

Petitioner contends that the murder was "unexpected and accidental." (Doc. 214 at 113.) However, because "[t]he defendant does not have to intend to kill beforehand to satisfy the statute," *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990), the fact that Petitioner did not "set out to murder anyone" (Doc. 219 at 57) does not prevent application of the pecuniary gain factor. Moreover, the argument that the murder was accidental is not supported by the record. When he was discovered burglarizing the

Wagners' home, Petitioner attacked Mr. Wagner, pushing him out the front door and onto the ground and then stabbing him seven times. *Gonzales*, 181 Ariz. at 506, 892 P.2d at 842.

Second, regarding his vagueness facial challenge to (F)(3), the Ninth Circuit has consistently rejected the argument that the pecuniary gain factor fails to narrow the class of death-eligible defendants. *See Williams*, 441 F.3d at 1059; *Woratzeck v. Stewart*, 97 F.3d 329, 335 (9th Cir. 1996).

Claim 30 is denied.

**Claim 33**

Prior to sentencing Petitioner, the trial court reviewed a presentence report that contained letters from Ms. Wagner and family friends recommending that Petitioner receive the death sentence. (ROA 380; *see* RT 4/27/92 at 43, 57.) Petitioner alleges that the court's review of these materials violated his Eighth Amendment rights. (Doc. 214 at 115.) The Arizona Supreme Court rejected this claim on direct appeal. *Gonzales*, 181 Ariz. at 516, 892 P.2d at 852. The claim is without merit.

In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the introduction of a victim impact statement to a capital sentencing jury violated the Eighth Amendment. In *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), the Supreme Court revisited *Booth* and overruled it in part, holding that the Eighth Amendment does not erect a *per se* barrier to the admission of victim impact evidence but leaving intact *Booth*'s prohibition on the admission of characterizations and opinions from the victim's family about the crime, the defendant, or the appropriate sentence. *Id.* at 830 n.2.

Under Arizona law at the time of Petitioner's trial, however, the trial judge, rather than a jury, determined the penalty in capital cases. In *Gulbrandson v. Ryan*, 738 F.3d 976, 995–96 (9th Cir. 2013), the Ninth Circuit rejected the petitioner's *Booth* claim, finding that there was no clearly established federal law directly addressing the question of whether a judge, as opposed to a jury, is prohibited from considering victim impact evidence. The court explained:

> We previously recognized this distinction in *Rhoades v. Henry*, 638 F.3d 1027 (9th Cir. 2011), where we held that *Booth*'s concern that victim impact statements would "inflame the jury" is "not the same when . . . a judge does the sentencing." *Id.* at 1055. As we have explained, courts "must assume that the trial judge properly applied the law and considered only the evidence he knew to be admissible." *Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997); *Rhoades*, 638 F.3d at 1055.
>
> Accordingly, because there is no Supreme Court case "squarely address[ing] the issue" whether a judge is barred from consideration of such victim impact evidence, it cannot be said that the Arizona Supreme Court unreasonably applied clearly established federal law when it denied Gulbrandson's Eighth Amendment claim.

*Id.* at 966.

Moreover, there is no evidence that the trial court disobeyed or misapplied the law by improperly considering the opinions of the victim's family when determining Petitioner's sentence. Nor is there evidence that the Arizona Supreme Court in its independent review of Petitioner's sentence improperly considered the victim impact evidence. Claim 33 is denied.

**Claim 34**

Petitioner alleges that Arizona's death penalty statute precludes the sentencer from considering all relevant mitigation, in violation of the Sixth, Eighth and Fourteenth

Amendments. (Doc. 214 at 118.)

At the time of Petitioner's sentencing, Arizona's capital sentencing statute provided:

> Mitigating circumstances shall be any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following [enumerated circumstances]:

A.R.S. § 13–703(G).

Petitioner contends that the statute "limit[s] the trial court in its consideration of mitigating circumstances to only those which are proffered by either the state or the defendant." (Doc. 214 at 118–19.) The Arizona Supreme Court's denial of this claim, *Gonzales*, 181 Ariz. at 507, 892 P.2d at 843, was neither contrary to nor an unreasonable application of clearly established federal law.

In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), the Supreme Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." The definition of mitigating circumstances set out in A.R.S. § 13–703(G) is consistent with this principle. The reference to "factors proffered by the defendant or the state" cannot reasonably be read as prohibiting a sentencer from considering any form of relevant mitigating evidence.

**Claim 36**

Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth and

Fourteenth Amendments because it requires a death sentence to be imposed whenever an aggravating circumstance and no mitigating circumstances are found. (Doc. 214 at 119.) The Supreme Court has rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty. *Walton v. Arizona*, 497 U.S. 639, 651–52 (1990), *overruled on other grounds by Ring*, 536 U.S. 584; *see also Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006). Accordingly, Claim 36 is denied.

**Claim 39**

Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a defendant to affirmatively prove that the court should spare his life. (Doc. 214 at 120.) The Supreme Court has rejected the argument that "Arizona's allocation of the burdens of proof in a capital sentencing proceeding violates the Constitution." *Walton*, 497 U.S. at 651. Claim 39 is denied.

**Claim 40**

Petitioner alleges that Arizona's death penalty statute is unconstitutional because it lacks ascertainable guidelines for the sentencer to follow in weighing aggravating and mitigating factors, in violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 214 at 121.)

Arizona's death penalty scheme allows only certain, statutorily-defined aggravating circumstances to be considered in determining eligibility for the death penalty. This scheme has been found constitutionally sufficient. *See Lewis*, 497 U.S. at 774–77; *Walton*, 497 U.S. at 649–56; *Woratzeck*, 97 F.3d at 334–35; *Smith*, 140 F.3d at

1272.

There is no Supreme Court authority which constitutionally requires that a jury be instructed on a burden of proof in the sentence selection phase in a capital case; nor is there any Supreme Court authority which would require a burden of proof or persuasion be assigned to any of the jury's penalty phase determinations. On the contrary, the Supreme Court has held that a "capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." *Tuilaepa v. California*, 512 U.S. 967, 979 (1994); *cf. Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988) ("[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."). Claim 40 is denied.

**Claim 41**

Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth Amendment because it does not afford capital defendants an opportunity to *voir dire* the sentencing judge. (Doc. 214 at 122.) This claim is meritless.

Petitioner cites "no authority for the proposition that a defendant has a constitutional right to voir dire a judge, let alone to inquire about a judge's views on the death penalty." *Atwood v. Schriro*, 489 F.Supp.2d 982, 1059 (D.Ariz. 2007). The rule providing for inquiry into prospective jurors' views on capital punishment derives from the right to an impartial and unbiased jury under the Sixth and Fourteenth Amendments. *See Morgan v. Illinois*, 504 U.S. 719, 726 (1992). Trial judges are presumed to follow the law. *Walton*, 497 U.S. at 653; *see State v. Rossi*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987) (explaining that mere possibility of bias or prejudice does not entitle a criminal

defendant to *voir dire* the trial judge at sentencing). Because Petitioner has not shown that he has a constitutional right to *voir dire* a sentencing judge, the state court's refusal to recognize such a right is neither contrary to nor an unreasonable application of federal law.

**Claim 42**

Petitioner alleges that Arizona's capital sentencing scheme violates the Eighth and Fourteenth Amendments because it affords the prosecutor unbridled discretion to seek the death penalty. (Doc. 214 at 124.) The claim is meritless. Prosecutors have wide discretion in deciding whether to seek the death penalty. *See McCleskey v. Kemp*, 481 U.S. 279, 296–97 (1987); *Gregg v. Georgia*, 428 U.S. 153, 199 (1976) (explaining that pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional). The Ninth Circuit has rejected the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." *Smith*, 140 F.3d at 1272.

**Claims 45, 47, 48, and 50[16]**

Petitioner raises several claims of ineffective assistance of trial counsel. He raised these claims in his first PCR proceeding. The state court found the allegations in Claims 45, 47, and 48 precluded because Petitioner could have raised them on direct appeal. (ME 4/21/98.) However, this Court found the claims were not defaulted because the state court

---

[16] In his memorandum on the merits, Petitioner states that he "dropped" Claim 46. (Doc. 215 at 128.) The Court will not consider the claim.

did not apply an adequate procedural bar. (Doc. 97 at 30.) Because the state court did not reach the merits of Claims 45, 47, and 48, this Court's review is *de novo. See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

The state court addressed the allegations in Claim 50 on the merits and denied the claim. (ME 4/21/98; *see* Doc. 97 at 30.) Therefore, the Court will review Claim 50 under the standards of 28 U.S.C. § 2254(d)(1).

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 674 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

With respect to *Strickland*'s second prong, a defendant must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Id.* at 694.

"Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. 788. As the Court explained in *Richter*:

> Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." [*Strickland*, 466 U.S.] at 689. The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. [*Id.*] at 690.

*Id.*

Claim 45

Petitioner alleges that trial counsel performed at a constitutionally ineffective level by failing to raise an objection or move for a mistrial when he discovered that Deborah Wagner and Roger Daughtry had a conversation prior to Daughtry's testimony in the second trial. (Doc. 214 at 124.) This claim satisfies neither prong of *Strickland*. As discussed above, the record does not suggest that the conversation between Ms. Wagner and Daughtry affected either's testimony. During his cross-examination of Daughtry, counsel brought out the fact that Daughtry had discussed the case with Ms. Wagner. Under these circumstances, counsel did not perform deficiently failing to object or move for a mistrial, and there was a not a reasonable probability of a different verdict if he had.

Claim 47

Petitioner alleges that trial counsel performed at a constitutionally ineffective level when he failed to object or move for a mistrial in response to the hearsay testimony of a police detective regarding Cathy Trinidad's previous statements. (Doc. 214 at 128.)

Cathy Trinidad, then 11 years old, testified in the second trial. (RT 6/3/91 at 18-46.) During her testimony, the prosecutor asked, "when you talked to the police detectives, did you tell those detectives that Mr. Gonzales said that a man stabbed him while a woman tried to tie his legs together with the strap on her purse?" (*Id.* at 29.) Cathy responded "Yes." (*Id.*) She testified that Petitioner said he was stabbed because "he was breaking in their house." (*Id.* at 30.) She also testified that when he came to the apartment, Petitioner had a brownish colored purse. (*Id.*) Inside the purse, she saw a "cigarette thing with the lighter in it and just bank cards and stuff." (*Id.* at 31.) She denied telling the police that Petitioner had a knife. (*Id.* at 31, 34.) She also denied telling the police that Petitioner had a hat when he left the apartment. (*Id.* at 25, 35–36.)

In his cross-examination, defense counsel used Cathy's previous testimony to bring out inconsistences with the State's theory of the case, including the time at which Petitioner left the apartment, what he was wearing, his explanation for why he was bleeding when he returned, and Cathy's statement that a sketch shown on the television news did not look like Petitioner. (*Id.* at 38–42.) Counsel also impeached Cathy's testimony about what Petitioner said about being in the house. (*Id.* at 42.) He asked, "Do you remember you [sic] giving this answer: He didn't say nothing about that. I heard on the news that someone broke in someone's house." (*Id.*) Cathy agreed that she had said that. (*Id.*)

The following day, the prosecution recalled Detective Charles Hodges to testify about his interview with Cathy. (RT 6/4/91 at 114–18.) Hodges testified that Cathy told him that Petitioner said he had been in the house "to get some money." (*Id.* at 116.) When asked, "Did she tell you anything happened while Mr. Gonzales was in that home?" Hodges testified that Cathy told him that Petitioner said "he had had to stab a man and a woman because she tried to tie him up." (*Id.*) The following exchange then occurred:

> Q: Did she tell you—did you ask her any questions about why Mr. Gonzales had to stab stab [sic] these people?
>
> A. Yes. I asked her why—
>
> [Defense Counsel]: I object. I don't believe it's proper.
>
> THE COURT: The objection is overruled. I think basis of my ruling [sic].
>
> THE WITNESS: She told me the reason was because they had tried to tie him up.

(*Id.* at 117.)

Petitioner argues that counsel performed ineffectively by making only a "general objection" that was "[p]redictably" overruled. (Doc. 214 at 129.) He contends that "reasonably effective counsel" would have raised a hearsay objection. (Doc. 220 at 83.)

Petitioner does not meet his burden of showing that counsel's performance here was deficient or prejudicial. Counsel raised an objection, which the court overruled. Specifying that the objection was based on hearsay would not have changed the court's ruling, particularly since Cathy's testimony about why Petitioner was stabbed was inconsistent with her statement to Detective Hodges and therefore was likely

admissible.[17] Also, as Respondents note, competent counsel could have determined that pursuing the matter would simply have highlighted Cathy's damaging testimony.

Counsel's performance was not deficient and did not prejudice Petitioner. Claim 47 is denied.

Claim 48

Petitioner alleges that trial counsel performed at a constitutionally ineffective level when he failed to object to the hearsay testimony of a police officer regarding Gloria Alvarez's statements to the police. (Doc. 214 at 133.) The claim is without merit.

In the second trial, Gloria Alvarez testified that when Petitioner came back to the apartment on February 20, 1990, she thought he was wearing a long white shirt with stripes and a short sleeved t-shirt underneath. (RT 5/30/91 at 130.) The prosecutor questioned her about her interview with the police:

> Q. Did you tell Detective Butler the defendant was wearing a white shirt with vertical stripes on it?
>
> A. When they were asking those questions I wasn't too sure what he was wearing. They kept insisting I knew what he was wearing that night. I was tired so, you know, I kept telling them what I thought he was wearing. They kept saying he was wearing this, they kept insisting I was lying.

(*Id.* at 143.)

On cross-examination, defense counsel asked Alvarez about the circumstances of her police interrogation. She testified that she was handcuffed to a table inside a small room for four hours. (*Id.* at 153–54.) She felt like the detectives were threatening to

---

[17] Arizona Rule of Evidence 801(d)(1) allows the admission of a statement that is inconsistent with the declarant's testimony.

charge her. (*Id*. at 155.) According to her testimony, the detectives kept insisting that she was lying about what Petitioner wore on the night of the crimes: "I would mention the color of [sic] shirt he was wearing, the design, and they said that I was lying, they knew I was lying." (*Id*. at 156.) She originally told them that it was a vertical striped shirt. (*Id*.) Later in the interview, the detectives suggested that it was a checked shirt. (*Id*.) When asked by defense counsel if she "recall[ed] today what kind of shirt it was?" Alvarez answered, "It was white with stripes on it." (*Id*.) She testified that the detectives told her she would not be free to leave until she told them what they wanted to hear. (*Id*. at 157–58.)

On re-direct, the prosecutor asked:

Q: Did you tell Detective Butler Mr. Gonzales was wearing Levi's, checkered flannel shirt, red with blue and black in it, white tennis shoes along with a dark cap when he left?

A: I had mentioned what I thought he was wearing that night. After that they told me what they thought he was wearing and I agreed to it, because at that time they kept telling me I was not going out. I had been there for hours and I was not going to leave until they heard what they wanted to hear.

(*Id*. at 166.)

Detective Butler testified later in the trial. During the prosecutor's direct examination, the following exchange occurred:

Q: During the course of your interview with Miss Alvarez did you ask her what clothes Mr. Gonzales was wearing the night of February 20, 1990.

[Defense Counsel:] I don't know where it was going. I don't think his [sic] in [sic] impeachable area.

THE COURT: Let's take the afternoon recess.

- 68 -

1

2

(RT 6/4/91 at 132.)

3

4

During the recess, defense counsel explained the basis of his objection. (*Id*. at

5

133–35.) He argued that the fact Alvarez had changed her testimony from what she said

6

at the police station was already before the jury and it would be improper impeachment to

7

allow Detective Butler to testify about her earlier statements. (*Id*. at 133.) The court

8

overruled the objection. (*Id.* at 135.) It found there was a "material difference" between

9

Alvarez's trial testimony about what Petitioner was wearing and the statements she gave

10

to the detectives. (*Id*.) The court also noted that Alvarez's "testimony was in my view

11

evasive as much as she could make it" and concluded that the testimony was inconsistent

12

13

enough to be allowed under Rule 801. (*Id*. at 135.)

14

Detective Butler then testified that during his interview of Alvarez, she had

15

"responded that Ernest was wearing a blue baseball cap, white tennis shoes, Levis, a

16

17

flannel shirt and red, black or blue squares in it." (*Id*. at 136.) Detective Butler also

18

acknowledged that Alvarez had originally told him that Petitioner was wearing "a white

19

shirt with vertical stripes in it." (*Id*.)

20

21

Petitioner contends that counsel's objection was "clumsy" (Doc. 214 at 134) and

22

that counsel did an inadequate job explaining the legal basis for the objection when the

23

24

parties met with the judge during the recess. (Doc. 220 at 75.) Notwithstanding

25

Petitioner's characterization of the objection, it is clear that counsel was challenging the

26

State's position that the testimony was admissible as a prior inconsistent statement. It is

27

28

also clear, as the trial court found, that Alvarez's trial testimony about Petitioner's clothes was both evasive and inconsistent with her statement to the detectives.

A trial court "has considerable discretion in determining whether a witness's evasive answers or lack of recollection may be considered inconsistent with that witness's prior out-of-court statements." *State v. Salazar*, 216 Ariz. 316, 319, 166 P.3d 107, 110 (App. 2007); *State v. Hines*, 130 Ariz. 68, 71, 633 P.2d 1384, 1387 (1981) (explaining that "inconsistency is to be determined, not by individual words or phrases alone, but by the whole impression or effect of what has been said or done"). The trial court reasonably determined that Detective Butler's testimony was admissible, and it is speculation to assert that a more detailed objection would have persuaded the court otherwise. Such speculation is insufficient to meet Petitioner's burden under *Strickland*.

Counsel's performance was not deficient and did not prejudice Petitioner. Claim 49 is denied.

Claim 50

Petitioner alleges that trial counsel performed at a constitutionally ineffective level by failing to request the appointment of a second lawyer as recommended by ABA Standards. (Doc. 214 at 138.)

The PCR court denied this claim, explaining that "no authority other than ABA recommendation is cited; and, although the Arizona Supreme Court has amended the criminal rule on the point, effective Jan. 1, 1998, the law on the matter remains against defendant." (ME 4/21/98.) The court cited *State v. Lee*, 189 Ariz. 590, 601, 944 P.2d 1204, 1214 (1997), which noted that Rule 6.2 of the Arizona Rules of Criminal

1    Procedure, requiring the presiding judge to appoint two counsel in capital cases, became

2    effective on January 1, 1998. At the time of Petitioner's trial, however, Arizona law did

3

4    not require the appointment of two attorneys.

5        Petitioner focuses his argument on the ABA guidelines. However, as the Seventh

6    Circuit has noted when addressing a similar argument based on the guidelines, "[t]he key

7

8    word here is 'recommended.' Trial counsel cannot be said to be constitutionally

9    ineffective for deciding not to bring in co-counsel, unless there is some reason . . . why

10   the first lawyer is unable to provide adequate representation." *Pitsonbarger v. Gramley*,

11

12   141 F.3d 728, 738 (7th Cir. 1998).

13       Thus, failure to seek the appointment of second counsel can give rise to habeas

14   relief only if this Court first determines that the absence of co-counsel prejudiced the

15

16   defense. *Cf. Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (explaining there can

17   be no deficient performance unless the record shows that counsel was unable to try the

18   case alone); *Riley v. Taylor*, 277 F.3d 261, 306 (3d Cir. 2001) ("The Constitution does

19

20   not specify the number of lawyers who must be appointed. If a single attorney provides

21   reasonably effective assistance, the Constitution is satisfied, and if a whole team of

22   lawyers fails to provide such assistance, the Constitution is violated.").

23       The record does not show, and Petitioner does not argue, that counsel was unable

24   to try this case alone. The PCR court's denial of this claim was neither contrary to nor an

25

26   unreasonable application of clearly established federal law. Claim 50 is denied.

27                                **CERTIFICATE OF APPEALABILITY**

28       Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, an applicant

cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer. Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant. If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

Under § 2253(c)(2), a certificate of appealability may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a certificate of appealability will issue only if reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claims 9, 14/15, and 27. For the reasons stated in this order, the Court finds that reasonable jurists could not debate its resolution of the remaining claims.

## CONCLUSION

Based on the foregoing,

**IT IS HEREBY ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Doc. 28) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

- 72 -

1       **IT IS FURTHER ORDERED** that the stay of execution entered by this Court on

2

3  November 16, 1999 (Doc. 3), is **VACATED.**

4       **IT IS FURTHER ORDERED** granting a certificate of appealability with respect

5  to Claims 9, 14/15, and 27.

6       **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of

7

8  this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

9  85007-3329.

10       DATED this 11th day of August, 2015.

11

12

13

14                _____

15                Honorable Stephen M. McNamee
              Senior United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28